GEORGE HAWKINS WILLIAMS, Trustee *vs.* ERNAULT H. WILLIAMS.

*Voluntary deed of Trust—Confidential relations between Grantor and Grantee—Duty of Grantee towards Grantor— Vacation of Deed—Party to the Proceedings.*

By a deed dated the 31st of May, 1882, the grantor in consideration of the sum of one dollar and other good causes and considerations him thereunto moving, conveyed all his estate and property of every sort and description to the grantee, in trust, to receive and collect the rents, issues and profits thereof and therefrom, to pay over to the grantor the sum of $2000 *per annum,* and no more, during his natural life, and to invest and re-invest the surplus, if any, as to the trustee may seem most advantageous, and then, in further trust, to convey the said property and estate, on the death of the grantor, to his right heirs living at the time of his death. It also contained an irrevocable power of attorney to the trustee to do and perform all and every thing in regard to said property which the grantor might or could have done if this deed had not been executed; and it further stipulated that the trustee should

have full power and authority to increase said annual allowance to the grantor if it should seem proper to the trustee at any time thereafter so to do; and that the trustee should have power to appoint by any instrument in the nature of a will the person who should succeed him in the trust. The grantor, at the date of the deed, was about twenty-five years of age, and unmarried, but was engaged, and the marriage was to have taken place a short time thereafter. The property conveyed, real and personal, amounted to some $250,000. The grantee in the deed was the father of the grantor, and at the time of its execution, and for some time before, the relation of trustee and *cestui que trust*, in respect of the greater part of the property conveyed by it, existed between them. The grantor married within a few months after the execution of the deed, and a child, the fruit of this marriage, was born pending the proceedings instituted to vacate the deed. On the 13th of December, 1882, the grantor filed a bill, alleging that the execution of the deed had been procured by the abuse of the influence which the grantee possessed and exercised over him as father, and of the confidence he reposed in him as his confidential legal adviser; and that the grantee availed himself of an occasion when the complainant under great distress of mind had indulged in intoxicating liquors to such an extent as to deprive him, for the time being, of the power to resist such influences, to obtain from him the execution and delivery of the deed. The bill prayed that the deed should be annulled and set aside and the grantor restored to all the rights which he had before the execution of it. The answer met the allegations of improper influence with an explicit and emphatic denial. Much testimony was taken. It was HELD:

1st. That the relations between the grantor and the grantee of the deed were highly confidential: On one side was a weak and inexperienced young man, acting under the influence of abject and unreasoning fear; on the other side an able and experienced lawyer, *embracing with a calm and intelligent judgment all the circumstances of the occasion*; it was a transaction between a reckless spendthrift and the trustee of his estate.

2nd. That it was the duty of the grantee, the father of the grantor, to have reasoned with his son about the folly of the fear which oppressed him, and to have removed it if possible. He ought to have remonstrated with him against making so vast a sacrifice of his pecuniary interests, and to have pointed out to him that the deed was not a rational mode of escaping the difficulties which encompassed him.

Williams *vs.* Williams.

3rd. That the mere warning by the father, of the son, at the time of, or before, the execution of the deed, that he was taking an irrevocable step, and that he ought very deliberately to consider it, fell very far short of what the law required, and of what so important a step demanded.

4th. That looking at the confidential relations between the parties to the deed, the great inequality of the terms on which they stood, the enormous sacrifice of the pecuniary interests of the grantor; the benefits acquired by the grantee, and his other children; and the incapable condition of the grantor at the time of the execution of the deed, it must be annulled and set aside.

5th. That it was not necessary to make the child born to the grantor after the filing of the bill, a party to the proceeding, as in this case the only inquiries relate to the charges affecting the conduct of the grantee, and to them he alone must respond.

APPEAL from the Circuit Court of Baltimore City.

The Court below (FISHER, J.,) on the 24th of March, 1884, passed a decree vacating and setting aside the deed of conveyance made by Ernault H. Williams, the complainant, to George Hawkins Williams, the defendant, in trust, dated the 31st of May, 1882; and requiring the defendant to pay the costs of the proceedings. From this decree the defendant appealed. The opinion of this Court and the dissenting opinion of Judge MILLER, furnish a sufficient statement of the case.

The cause was argued before ALVEY, C. J., STONE, MILLER, ROBINSON, and BRYAN, J.

*S. Teackle Wallis,* and *Orville Horwitz,* for the appellant.

1. The leading and singular characteristic of this case is, that it has been decided below and is now argued, upon a concession of the gross falsehood of all the controlling averments of the bill. The *gravamen* of the case made by the complainant is, that his father, having great influence

and control over him, as parent and counsel, and being desirous to obtain possession of his entire estate and deprive him of his rights, and having for that purpose goaded and driven him into habits of intemperance so as to weaken in advance his powers of resistance, took advantage of an occasion when he was drunk, to overpower his will and terrorize him into executing a deed of trust, of the contents of which he knew nothing. Not only is this charge set forth under oath with great emphasis and detail in the bill, but it is repeated by the complainant himself, as a witness, in the most deliberate, detailed and emphatic way. He swears—not that he was deceived by the contents of the deed or misunderstood them, or was ignorant of his rights or his estate, but that he was so drunk, at the time he took the deed to the record office that he "didn't know what it was or what was in it:" that he not only did not read it, but "didn't look at it," and if he had looked at it he "never would have recorded it." In fine, he swore in words: "I was so drunk on the day I signed the deed of trust, that I did not know what I was about."

This is the case which the complainant furnished to his counsel, and maintained, so far as he could, by his oath. Of this case not one word is true, or has even the color of truth. The Court below rejected it altogether, and the evidence of its falsehood is so overwhelming that no effort, of counsel, can induce this Court even to consider it. Indeed the whole present theory of the case is rested upon alleged fiduciary relations between the parties, and influence unduly exerted by the father to induce the son to accept the provisions of the deed. It is believed to be an anomaly in equity, to grant relief upon a bill, where it is impossible to take a step in that direction, without assuming the entire falsehood of the case deliberately made and sworn to upon personal knowledge. Either the complainant was drunk or he was not. If he was not, his

whole case rests upon flat perjury. If he was drunk, and so drunk that he did not know what he was about, it is idle to talk about implied fraud, personal influence or over persuasion. In such a case there is no possible issue but one of gross fraud in fact—duress or deceit. Concede that a man not only did not know the terms or contents of a deed which he executed, but did not even know what it was, and there must be an end of all discussion founded on a criticism of the provisions of the instrument.

2. There is no longer any room to impute fraud, or bad, or sordid, or even interested motives to the appellant. An effort to do so was most strenuously made in the Circuit Court, but received no countenance from that tribunal. "I find," says Judge Fisher, "in the testimony, dispassionately considered, *no ground* for the imputation to the defendant of the sordid motives of personal gain ascribed to him in the bill, and no reason to doubt that he was actuated by the desire to promote what, from his point of view, he believed to be the welfare and interest of his son. The deed was, in fact, inimical to the personal pecuniary interests of the father." The suggestion of counsel that his commissions as trustee, were a temptation to him to defraud his son, is too minute for serious consideration. Even if taken into account, such commissions would be insignificant in comparison with the estate which was limited away from him by the deed of trust. And that the appellant, under any circumstances, would be moved by any personal end, and especially by so paltry a consideration, to defraud his son, is rendered impossible of belief by the overwhelming and uncontradicted proof, that he is, and always has been, among the kindest, most liberal and indulgent of fathers, and that of his children the appellee, by reason of his physical infirmities and in spite of his vices and ingratitude, has been the most indulged of all.

3. All suggestion or imputation of fraud, in fact, having been disposed of by the Court below, the case is rested

by the learned Judge on two grounds, substantially the following:

1st. That the alleged fiduciary relations between the parties render the deed voidable by the appellee as matter of public policy, and

2d. That the appellee, when he executed it, was in a state of terror induced by surrounding and peculiar circumstances which over-mastered his will, and that he was not made sufficiently aware by his father of the gravity of the step he was taking, or required to exercise greater deliberation in taking it.

1st. As to the alleged fiduciary relations: That the appellant was counsel for his son or advised him as such, as charged, is not only wholly unsustained by proof, but is positively and conclusively disproven.

The appellant is the father of the appellee, and was trustee for him, till he should reach the age of thirty, under the will of his grandfather. At the time of filing his bill he was about twenty-five.

It is believed to be the law of every case on the subject decided in Maryland, in conformity with the rule everywhere else, that there is no presumption of public policy against a deed from a *cestui que trust* to any fiduciary, unless it be made at the request or upon the inducement of the latter and for his personal benefit. It must be the case of "a trustee, agent or director, *bargaining in a matter of personal advantage to himself individually,* with the party reposing confidence in him." *Booth vs. Robinson,* 55 *Md.,* 441; *Grove vs. Todd,* 33 *Md.,* 188; *Brooke vs. Berry,* 2 *Gill,* 83.

The whole theory upon which the avoidance of such transactions, on grounds of public policy, irrespective of the merits of the individual case, is rested, is to "remove from trustees all temptation to violate their duties by *securing to themselves profit and advantage* at the expense of those whose property and interests are confided to their

charge." *Pairo vs. Vickery,* 37 *Md.,* 467, 484–485. And see *Bispham's Prin. of Equity,* 105, *sec.* 93; *Adams' Equity,* 60 *(marg.)*; *Hoghton vs. Hoghton,* 15 *Beav.,* 278; *Archer vs. Hudson,* 7 *Beav.,* 551; *Bergen vs. Udall,* 31 *Barb.,* 9.

The case of *Huguenin vs. Baseley,* (2 *Lead. Cas. in Equity,* 1156), is cited to show that the same presumption exists against the fiduciary, in any conveyance made to or induced by him for the benefit of any third person, although it is free from fraud, and the trustee derives no benefit himself. A careful examination of that case will show that it does not in any way countenance any such doctrine. It was a case of gross fraud in fact, and undue influence, where a clergyman obtained large gifts, from a lady under his spiritual direction, for his own personal benefit and that of his family. The Chancellor justly held—as to the gifts to the family—that they were subject to avoidance precisely as those to the clergyman himself, on the ground that he could no more be permitted to abuse the confidence and influence of his spiritual office for the benefit of his family than for his own, though his family might be innocent. The doctrine laid down was precisely that established in cases where a will or devise is procured by undue influence, viz., that the undue influence, being fraudulent in fact, cannot be countenanced even in favor of innocent beneficiaries. But this is fraud in fact, where the transaction is avoided because it is actually fraudulent, and not because fraud is constructively imputed upon grounds of public policy. All the language in *Huguenin vs. Baseley* relied on in argument relates to and is predicated of the actual fraud found by the Court.

Such is the construction placed in England as well as this country on that case. See *Middleton vs. Sherburne,* 4 *Younge and Collyer, Exch. Cases,* 390, 391. And it manifestly could not have been otherwise, for the Court would have had no occasion to consider the actual fraud on

which it dwells, if the transaction had been inoperative on the plainer and simpler ground of public policy, whether actually fraudulent or not. There is not one word in the case to affect the rule of this Court as announced in *Pairo vs. Vickery, supra,* that the doctrine of public policy imposes no prohibition upon fiduciaries, except where they acquire rights "which may bring *their personal interests* in conflict with the discharge of their official duties." And it will be remembered that in this case the "third parties" spoken of, and always characterized as the "other children" of appellant, are the brothers and sisters of the appellee, his heirs-at-law, to whom it would be presumed that he would be as likely as his father to desire that his estate should go, if he should die childless.

3. It is hardly necessary to notice the contention that the execution of the deed impeached was procured by the urgency, request or suggestion of the appellant. No witness but the appellee ventures to say that it was, and the proof to the contrary is overwhelming and unanimous, from the many witnesses who had cognizance of the transaction. The deed was suggested and dictated by the appellee himself, of his own accord, and in his father's absence, and his father had no knowledge that it was contemplated until so advised by the counsel whom the appellee requested to draw it. Its terms were unknown to the appellant until the rough draft was shown to him and its acceptance was urged on him by appellee, against his earnest caution and remonstrance that the appellee should not execute it without further deliberation. The appellee insisted on executing it, and then took it himself to the record office and paid for recording it.

On no point in the case is the evidence of impartial, respectable and intelligent witnesses more entirely consentaneous than in this.

4. The appellant not only having had no personal benefit or advantage from the execution of the deed, but

the same being plainly against his personal interest, and he having, moreover, neither suggested nor induced its execution, the only remaining questions are, whether the deed was executed by the appellee, in ignorance of his rights; whether or not his will and judgment were terrorized by surrounding circumstances, and whether his father was, or was not in default, in not having prevented the execution of the deed, or given him information, which he did not possess, as to what he was doing.

These points are best discussed together.

It is in evidence, uncontradicted, that although the appellee was capricious and inconsequential in his mental habits, and had frustrated all his father's efforts to give him a good education, he was sharp at a bargain, quick in the perception of his own interests, and prompt to take care of them. He understood fully what his rights were under Mr. Gittings' will, and at the very time of the execution of the deed impeached, he had furnished the lady whom he was about to marry with a copy of the will and of the schedule and list of property distributed to him under it. He and she had considered these, together, in connection with a deed of trust to his father very similar to the one in dispute, which he had himself caused to be prepared, and had submitted to her a month before, and which was in her possession at the time. She had notified him definitely, as he stated over and over, that she would never marry him if he made any deed of trust whatever. It is indeed clear from the proof, and has been frankly admitted in the argument here, that he is " a man whom no woman would marry, except for his money."

It is proven, and not disputed, that from the time the appellee had acquired his property he had been anxious to make a deed of trust of it, in order, as he repeatedly stated, to protect it from the chances and consequences of his own conceded bad habits. He had not only caused the deed of trust, already referred to, to be prepared, but had pre-

Williams *vs.* Williams.

viously importuned Mr. Dawson, long and constantly, to prepare others, and had actually caused to be prepared by him, and had executed, an absolute deed of his entire estate to his mother, for his own protection, as he said, and relying, as he testifies, upon her doing a mother's part by him. That deed the appellant would not permit his wife to accept. In fact, the appellee, as proven, had " deed of trust on the brain," in season and out of season. Mr. Williams, on his part, had always strenuously resisted and prevented his son's divesting himself of his estate, or any part of it. Upon this point there is no conflict in the testimony.

All this had preceded the transaction in dispute, and it indicates the deliberate frame of mind and purpose of the appellee. If, therefore, the deed in question had been executed by him under the influence of terror, as was held by the Court below, that terror could only have renewed the disposition and purpose to execute a deed of trust which he had manifested so often before, and was so persistently bent upon carrying out. The terror, if it existed at all, only affected his making a deed of trust, in so far as it created what he deemed an occasion for his making one. It could not in any way obliterate the thorough knowledge which he had of the nature and extent of his estate, or render him in the slightest degree insensible to the precise signification of an act *so long contemplated*, and which he was then doing with a specific and declared purpose.

The whole cause of the excitement which he manifested on the day referred to, was an apprehension that his physicians would disclose the existence of the causes which justified them in insisting that he should not carry out his announced purpose of marrying. It was not an apprehension which had anything to do with the execution of the deed, or any relation to that or any other deed, except in so far as he felt that the execution of a deed of trust

would relieve him from the embarrassment of an engagement to be married at once, from which he desired, and was compelled by his condition, to escape. The lady had told him that she would never marry him if he executed such a deed, and he accordingly executed it to relieve himself from the *onus* of breaking off the marriage, and to put that *onus* on her. The appellee of his own choice adopted the plan of executing a deed of trust so long contemplated by him and prescribed its provisions, as the best mode of escaping from the embarrassments of his situation, and his father not only did not prompt him to execute it, but advised him strenuously to reflect and deliberate further before he executed it, and accepted the trusteeship with reluctance. From the moment the deed was executed the appellee became relieved entirely from the pressure of all embarrassment, except as to the possibility of violence from the male relatives of the lady. He volunteered to express his satisfaction at its execution to half a dozen intelligent persons of the highest repectability at different times and places, that very day, congratulating himself upon having done what he considered the most fortunate act of his life. He expressed to those witnesses his confidence in his father, whom he had made trustee, as "his best friend," and never indicated any dissatisfaction with the deed until after he had returned from Europe, and had gone to the house of his intended father-in-law, instead of his own home. In leaving town, immediately after the execution of the deed, he but followed the advice long before, and frequently given him by his physicians, to proceed to Kreuznach in Germany; where the waters are supposed to be almost a specific for the disease under which he was laboring. His determination to go at that time was altogether his own, without urgency or suggestion from his father or anyone else, and he formed it, because it afforded him not only an opportunity of escaping the personal ill treatment, of which he was fearful, but of being restored

to health after years of a loathsome disease. The expressions of satisfaction, which he addressed to the witnesses referred to, were repeated, when he was abroad, a month and more after the deed was executed and three thousand miles from home. This was proven incontestably by a respectable and unimpeached witness, his courier and attendant, whom the appellee himself was not even called to contradict. In conversation with that witness, to whom he had spoken of marrying, and who told him that no woman would marry him in his diseased condition, except for his money, he replied that his property was protected against any designs of that nature, by a deed of trust to his father, who was his best friend. He even went so far as to explain to the witness, who was a foreigner, and not familiar with our laws, the meaning and operation of a deed of trust. He assigned to the witness as his reason for making this particular deed of trust, that he realized his inability to manage his property himself. The testimony of this witness, although vitally affecting the most important issue in the case, and absolutely uncontradicted, seems to have escaped the notice of the learned Judge below, as it is not referred to in his opinion.

The whole case is, in fact, the result of a conspiracy on the part of the family into which the appellee had ultimately married, to get possession of his fortune. The young lady who had declared to him that she would not marry him if he executed any deed of trust, did marry him after he executed it, and the next move was to do the next best thing, namely to set the deed aside, if practicable, and get the money. From the moment the unfortunate young man reached Europe, he was persecuted by letters from the Hazlitt family and their counsel, urging his return. The son, of whose violence he had expressed so much apprehension, when he executed the deed of trust, and whom he went to Europe in part to escape, soon followed him

there on the same errand.   The result was, that although advised by the able specialist whom he consulted at Kreuznach, to remain at least a year abroad as essential for the restoration of his health, he returned, in the course of three months, to the City of Baltimore and proceeded directly from the steamer to Mr. Hazlitt's house.   From the time when the deed was executed down to that time, all his letters to his father had been of the kindest and most affectionate sort.   He sent messages to him of the same tenor, and spoke of him with affection and respect, and as his best friend.   He expressed his confidence that his father would give him all the money that he needed ; and not the slightest murmur of discontent or dissatisfaction, much less of complaint, in regard to the deed, or of a desire to have it cancelled or modified, was at any time heard from him.   It was not until he had got under the personal control of the people who had entrapped him, that he signified to his father, for the first time, and then only through counsel, that he desired to repudiate the deed. From the time of his arrival, he never visited his father or the family home, and the first news that the father had of his marriage, was accidentally had from the keeper of a toll-gate on the turnpike road to his farm.   It seems sufficient to state these facts, in order to characterize the spirit and integrity of this entire proceeding on the part of the appellee ; and when it is further remembered, as has already been said, that the proceeding was begun by a bill sworn to by the appellee, of which every material word is conceded to be false, the picture is complete.   It has been admitted, indeed argued by appellee's own counsel, in this Court (as already stated,) that the appellee is a man whom no woman *would marry* but for his fortune.   If the father, desiring and hoping to prevent this sacrifice of his son to a mercenary speculation, and to protect him from his own folly and vices, had in fact influenced him and induced him to execute a deed

of trust, to save him and his fortune from such hands, there is no right minded man who could feel that he did anything but his duty as a parent. He might well have exercised for so proper and commendable an end, all the influence which he is charged with exercising, but did not, and have acted in so doing under the highest sanctions of good morals and the law. The law is not so far at war with reason and that parental and filial relation on which society rests, as to preclude a parent from exercising an honest and proper influence over a wayward and dissolute child, to save him from himself. The law implies no fraud from such a discharge of the highest of parental duties, but commends and upholds it. *Jenkins vs. Pye,* 12 *Peters,* 252 *to* 254; *Blackborn vs. Edgley,* 1 *Peere Williams,* 600.

[Counsel did not argue the point as to the want of proper parties.—REPORTER.]

*Charles Marshall, John V. L. Findlay,* and *Robert Gilmor,* for the appellee.

The appellant, at the time the deed of trust was executed, stood in relations of trust and confidence to the appellee.

He was his father; he had charge of all his property, and of such legal business as concerned his property, and by appointment of the Circuit Court for Baltimore County, he was trustee under the will of John S. Gittings. The appellee was one of the beneficiaries under that will, deriving most of his estate from that source, and by the terms of the will, the appellant, as substituted trustee, held the entire interest of the appellee and his other children in trust, until they should attain the age of thirty years.

The interest of the appellee under the will was a vested interest, with a present right to receive the income.

As far as it was possible to show the value of his whole estate at the date of the deed, it was not less than $300,000, consisting to a large extent of personal property.

The deed of trust practically stripped the appellee of this large estate, leaving him no part of the principal, and no income except an annuity of $2,000.

His children would have taken at his death if he had any. But he was not married at the time, and in case of his marriage, he was deprived of all power to provide for his wife, except from his annuity, and in the event of his death leaving a widow, there was absolutely no means of making any provision for her.

The deed gave the appellant discretion as to the disposition of all income beyond the annuity of $2,000, and as far as considerations of a pecuniary nature might affect the probability of the marriage of the appellee, the control of that matter was placed by the deed mainly in the hands of the appellant.

The deed deprives the appellee of the power to dispose of his estate by will, and after making his marriage depend in a large measure on the discretion of the appellant, places the children of the appellant in immediate expectancy of the whole estate, for in the event of the death of the appellee without lawful issue, the children of the appellant would have been entitled to all his estate as distributees and heirs-at-law of the appellee. Besides these important interests created in the children of the appellant by the deed of trust, the appellant himself would have the commissions and compensation arising from the management of this large estate, and from the receipt and accumulation of the income over and above the annuity of $2000.

This immediate and apparent interest brings the deed of trust so directly within the principles of law, which we claim to be applicable to this case, that the appellant has

sought to meet the objection by disclaiming in his answer any desire to have these commissions.

Independently of the benefits above pointed out which the appellant and his family derived from the deed of trust, the great detriment and injury sustained by the appellee from its operation, converting him as it does, from the owner of a large estate into a pensioner of it, is apparent, and we shall maintain that in view of the relations between the parties, detriment and injury to the grantor in such a transaction, is fatal to the deed, irrespective of the question of benefit to the grantee.

Our first proposition is, that when a deed is made to a grantee who is at once the father, the business adviser, and the trustee of the grantor, conferring such valuable interests in the trust estate upon the grantee and his family, and imposing such loss and detriment upon the grantor, the law *prima facie* condemns the deed, and casts upon the grantee the obligation to satisfy the Court that the transaction was in all respects fair and reasonable, made voluntarily and deliberately, and with full knowledge on the part of the grantor, of all facts material for one to know and understand who was about to make so important a deed, and with full and clear understanding on his part of the legal effect of the deed. We do not claim that the deed is void as in cases in which a trustee buys at his own sale, but we claim that the relation of confidence casts upon the grantee the burden of proof to show the entire fairness, reasonableness and good faith of the transaction. *Huguenin vs. Baseley,* 2 *Lead. Cases in Eq., pt.* 2, *p.* 1156 *and notes;* 1 *Story Eq. Juris.,* secs. 222, 234, 248, 251, 253, 303-322; *Rhodes vs. Bate,* 1 *L. R. Ch. Ap.,* 252; *Hill on Trustees,* 237-254, 535; *Kerr on Injunctions,* 45-49; *Taylor vs. Taylor,* 8 *Howard,* 183; *Cherbonnier vs. Evitts, et al.,* 56 *Md.,* 276; *Todd vs. Grove,* 33 *Md.,* 188; *Pairo vs. Vickery,* 37 *Md.,* 467; *Highberger vs. Stiffler,* 21 *Md.,* 338; *Davis vs. Calvert,* 5

*G. & J.,* 302; *Miskey vs. Miskey,* 15 *Philadelphia Reports,* 83, *affirmed by the Supreme Court of Pa., January Term,* 1883; *Cumberland Coal Co. vs. Parrish,* 42 *Md.,* 598; *Michoud, et al. vs. Gerod, et al.,* 4 *Howard,* 503; *Hoffman Steam Coal Co. vs. Cumberland Coal & Iron Co.,* 16 *Md.,* 456.

Applying the rule established by the authorities we have cited, to the present case, we turn to the explanation of the deed given us by the appellant, as he was bound to do, and we find it established by his own witnesses and by his own admissions.

1st. That the grantor was mentally *"not over strong,"* in the language of the answer of the appellant, and that he was a person wholly different from other men, according to the testimony. Peculiar, excitable, timid to an excess, vacillating and unsteady of purpose, easily led by his fears, reckless, improvident and greatly addicted to the use of intoxicating drink. The uncontradicted evidence shows that Mr. Horwitz, the attorney who drew the deed, declared only the day before, that the appellee "was not competent to manage his affairs."

2d. That he had before contemplated making a deed of trust of his property, but had never been willing to make the appellant his trustee.

3d. That at the time he made this deed, and during the whole of the rest of that day, and the two following days, the appellee was under the influence of a groundless and irrational terror, and that the deed was made under the influence of this overmastering fear. This terror "haunted" him, in the language of the counsel for the appellant, when the deed was executed, and for two days afterwards.

4th. No attempt was made by the lawyer who drew the deed, and who was the retained attorney of the appellant as trustee, to remove this groundless terror, although he knew that the appellee was under its influence.

5th. Other persons in the interest of the appellant, and acquainted with his wishes that appellee should execute a deed of trust of his property, and who were active in bringing about the execution of the deed, actually encouraged the appellee to yield to the promptings of his insane terror.

6th. The appellant knew that the appellee executed the deed while under the influence of this overmastering terror, and not only did not try to remove it, but actually encouraged it.

7th. The deed was made hastily and upon a sudden impulse, when there was no necessity whatever for haste.

8th. It is said to have been made for the purpose of bringing about a rupture of a marriage engagement, and for that purpose only, and yet it went very far beyond what was necessary for that purpose, and tended to prevent any marriage at all at any time. It deprived the appellee of testamentary power over his estate, which was wholly unnecessary for the avowed purpose of the deed, and contained no clause of revocation by which, when its alleged object had been attained, the appellee might make any other settlement of his property.

9th. No information was given to the appellee as to the extent and value of his estate, and we have been unable to ascertain it even to this time from the appellant.

These are the main facts connected with the execution of the deed, as shown by the witnesses produced by the appellant, and we submit that they present a case wholly indefensible in a Court of equity as between son and father, client and counsel, *cestui que trust* and trustee.

Our second proposition is, that independently of the relations of trust and confidence between the parties, the deed cannot be upheld in view of the circumstances under which it was obtained.

The appellant was an experienced lawyer, the attorney who drew the deed was also. The appellee was such a

person as we have above described, and he went to the attorney of the appellant and to the appellant himself for aid and advice, while he was under the dominion of a "haunting terror."

With their co-operation and assistance, while so possessed with an unreasonable and unreasoning fear, he stripped himself of his whole estate, save the pittance reserved to him for life by the deed. No one sought to allay his fear, no one told him that there was no need of haste, no one explained to him how great his estate was, no one told him how completely the deed deprived him of his estate. What he, in his blind terror, was ready and eager to give, the appellant took without remonstrance, without explanation, without remorse. Had such a deed been made under such circumstances between strangers, it could not stand for a moment. *Wheeler vs. Smith, et al.,* 9 *Howard,* 53 ; 1 *Story, Eq. Jur., sec.* 239 *(notes); Evans vs. Llewellin,* 1 *Cox,* 340 ; 33 *Md.,* 37 *Md., and* 56 *Md., supra.*

As to the necessity of making the child born to the appellee since the suit began, a party, we submit that all volunteers whose claims arise under such a deed, are bound by a decree in a case in which the grantee is defendant, and their interests are sufficiently represented by him. *Davis vs. Calvert,* 5 *G. & J.,* 302; *Kerrison vs. Stewart, et al.,* 93 *U. S.,* 155 ; *Campbell vs. Watson,* 8 *Ohio,* 500.

BRYAN, J., delivered the opinion of the Court.

On the thirty-first day of May, 1882, Ernault H. Williams conveyed all his property of every kind to his father, George H. Williams, the appellant in this case. It was stated in the deed of conveyance that it was made in consideration of one dollar, and for "other good causes and considerations." The property was conveyed to the grantee and his heirs forever, on certain trusts declared in the deed ; these were that he should collect the rents,

issues and profits during the natural life of the grantor; and pay over to him the sum of two thousand dollars per annum, and no more; and to invest and re-invest the surplus of said rents, issues and profits, at his discretion; and in further trust to convey the property, on the death of the grantor to his, the grantor's right heirs living at the time of his death. It was also stated in the deed that the grantor appointed the grantee his attorney irrevocably to act for him in regard to the property, and do everything thereabout which the grantor might have done, if the deed had not been executed. It was further provided that the grantee should have power to increase the annual allowance to the grantor, if it should seem proper to him to do so; and that he, the grantee, should have power, by any instrument in the nature of a will, to appoint the person who should succeed him in the trust. The greater portion of the property, thus conveyed, was acquired by the grantor under the will of his grandfather, the late John S. Gittings, Esq., but some of it came to him from his mother and a brother, both of whom are now deceased. The record does not furnish us with the means of making an accurate estimate of its value; but the evidence shows that it is probably worth more than ($250,000.00), two hundred and fifty thousand dollars.

On the 13th of December, 1882, Ernault H. Williams filed a bill of complaint against his father, in the Circuit Court of Baltimore City, in which he charged that his father was desirous to obtain possession and control of his estate; and to deprive him of his legal rights thereto; and to reduce him to a dependence on his will; and to secure for himself the benefits which would accrue from the possession and management of his son's large property; and to accomplish other objects which he personally desired on his own account to secure; and that he procured the execution of this deed, by the abuse of the influence which he possessed and exercised over his son, and of the confidence which

the son reposed in him as his father and confidential legal adviser. The bill also alleges that the complainant's father made certain statements that he had power under the will of Mr. Gittings to deprive the complainant of his interest under said will, and that he would exercise this power, unless the son's conduct should be satisfactory to him, and it further alleged that the father represented to the son that he was in great bodily peril, and urged him in order to escape it, that he should absent himself from the country, and place his property and affairs in the hands of his father; and that on an occasion when the son was in a state of intoxication, and unable to resist the influences brought to bear upon him, the father availed himself of the opportunity, and obtained from him the deed in question. The bill prays that the deed shall be annulled and set aside, and the grantor restored to all the rights, which he had before the execution of it. The answer denies, in the most explicit manner, all the charges in the bill which assail the integrity of the defendant's conduct and motives; and it avers that the deed was executed by the grantor of his own free will and accord. The bill was afterwards amended so as to charge that, at the time of the execution of the deed, and for sometime prior thereto, the father had been by the appointment of the circuit Court of Baltimore County, sole trustee, under the will of John S. Gittings, deceased. This appointment entitled him, among other things, to the possession and control of the property devised and bequeathed to Ernault, until he should reach the age of thirty years, with the duty to apply the income in the meantime to his support and maintenance.

The controversy in this case imposes a very painful duty upon the Court, but we cannot shrink from the full and faithful peformance of it. A candid and careful consideration of the evidence requires us to say that the aspersions made in the bill on the conduct and motives of the ap-

pellant are entirely unjust. We cheerfully and cordially acquit him of these charges; and if there were nothing else in the case we might stop here and dismiss this bill of complaint. But the validity of this deed cannot be determined without an examination of other questions which arise from the circumstances of the transaction, and the relations of the parties to each other.

Ernault H. Williams was a young man about twenty-five years of age. He had been afflicted with a severe illness in childhood, which had left permanent effects on mind and body, debilitating both to a very considerable extent. He was deficient in personal firmness, and seems to have been totally unable to cope with dangers suddenly assailing him. He had contracted the habit of drinking intoxicating liquors to great excess; and was licentious in his conduct in other respects. At the time of the execution of this deed he was suffering from a loathsome and immoral disease, the result of sensual indulgences. Notwithstanding his physical condition he was engaged to be married to a young lady residing in the City of Baltimore, and the marriage day was near at hand. On the morning of the 31st of May, 1882, he received a letter from Dr. Buckler, an eminent and estimable physician, in which he pointed out to him the criminality of contracting matrimony in the condition of his health at that time, and in which he said he must come to see him at once; and stated that if he failed to do so he would communicate to the young lady's father all the particulars concerning the condition of his health. This letter alarmed Mr. Ernault H. Williams very much. He was perplexed in the extreme. We find that about ten o'clock in the morning on which he received it, he was at the office of his cousin, Mr. James Gittings, in a state of great excitement and trepidation, saying that if the family of the young lady found out the condition in which he was, they would certainly kill him. The idea that his life was in danger had taken complete

possession of his mind, and seemed to overpower him. He was so entirely unnerved that when he desired to procure a messenger boy he was afraid to cross the street, stating that he "*might never get back alive.*" While under the influence of this mortal terror he formed the design of making this deed of trust. He said that the young lady had often told him that if he made a deed of trust she would not marry him. Turning over in his mind the embarrassments of his situation, it seemed to his disorderly reasoning that the most eligible way of escaping from them was to make such a deed ; the young lady would then discard him, he would thus escape the exposure which threatened him, without exposing himself to the vengeance of her relatives, which he so greatly feared ; but which seems to have existed only in his imagination. Another part of his scheme was that he would tell the young lady that his father compelled him to make this deed, and he would in this way retain her good will ; for he did not wish to break with her finally, but merely wished to extricate himself from the supposed dangers which threatened him. In this state of mind, and under the influence of these motives, he executed the deed in question. Under ordinary circumstances, it would be difficult to conceive of an act of such supreme folly ; or, of such childish motives controlling a transaction of such importance. But the evidence shews us what manner of man he was. We may mention some of the qualities attributed to him by the witnesses for the appellant. Aggregating them we find him spoken of as "not a normal man," but "erratic, eccentric, garrulous, ill-balanced, very unnatural, nervous, restless, very inconsistent, very vacillating, very capricious, very changeable." One of these witnesses says he was "very often nervous, excited and restless, sometimes for very slight reasons ;" another says "the same yardstick of measurement would not be applied to him, as a normal man."

The gentleman by whom the deed was drawn, in conversation on the day before its execution, said " he was incapable of business," and " of the management of his affairs." Several of the witnesses testify that he was a great coward physically. One of them, when asked to state what were his peculiarities, replied in these words : " Tremendous restless energy—never staying in one place long; he is a great coward physically." Several circumstances in evidence shew the intensity of the alarm into which he was thrown by Dr. Buckler's letter. He was found in his room crying on the afternoon of the day that he received it. By the advice of a physician it had been decided that he should go to Kreuznach, in Germany, to be treated for his disease. It was necessary for him to go to New York to take the European steamer, and he wished to leave that very night at one o'clock, saying he would go to Chicago. He left Baltimore about seven o'clock next morning in company with his cousin, Mr. James Gittings. At his own earnest request they went out of his father's house by the back way, and through an alley. Instead of taking the direct route to New York, they went to Harrisburg, and then to Lancaster, and left Lancaster after midnight in the train for Philadelphia. Mr. Gittings says in reply to a question from appellant's counsel that the fear which he expressed while in Baltimore continued to haunt him; that " he spoke of being much afraid of meeting them, of being followed; at Harrisburg he watched the trains very carefully—the trains from Baltimore ; looked at the schedules and asked the clerk at the hotel about them, and suggested himself very circuitous ways, by which he might go ; he was very much afraid he might be followed, on the way to New York he expressed fright." When in Harrisburg he bought a pistol and a box of cartridges for his protection. Mr. Gittings also says that he went to New York with him at the strong desire expressed by Ernault and his father ;

o

that his father (the appellant) told him that Ernault did not feel safe with anybody else. After the return of Mr. James Gittings from New York, where he had seen Ernault safely embarked for Europe, Mr. Williams, the father, writes to Ernault, saying, " To my great relief James has returned, saying that you were safely off. What a merciful escape ! I have received your letter, saying yon would be back in September. Why you are mad ; positively insane." " Some say that you are to be killed the moment you are again seen in Baltimore, and that lawyers have been employed, and detectives engaged to catch you. How much of truth there is in all this I cannot tell, and it does not do for me to do anything but keep silence." " You may he sued for breach of promise, and then you will see what a fool you have made of yourself by your absurd statements as to your wealth. How would you like to be reduced to beggary, and only my support to keep you from going to an almshouse ?" Then after speaking of Ernault's habits of drinking, as having been " tremendously on the increase the last few months," and warning him that in *his condition* this was certain death, the writer says : " However, if you do not stop it, it is as well to die that way, I suppose, as from a revolver ; better, for then no one but yourself will be the murderer. Stay with Willie and the girls (meaning his sisters) at Kreuznach, and get cured by those baths, as the doctors ordered, but if you will not take advice, then come home and be shot." It is proper to say that Mr. Williams (the appellant) in his testimony explains what he meant by the " merciful escape." To quote his language, he says " He had mercifully escaped the marriage of which I did not approve ; and if there was any truth in his statement that she had repeatedly said that the execution of this deed would frustrate it, and he had executed the deed, and gone to Kreuznach, he certainly was safely off." He also explains that on the day the deed was executed he did not

think that Ernault was in bodily danger; and that any opinion which he had that Ernault had been in danger was caused by a number of anonymous letters which had been sent to him, and by the information that Ernault had purchased a revolver at Harrisburg, and that he was apprehensive of being shot. But this letter very clearly shews that in the opinion ot Mr. Williams there were very urgent reasons why Ernault should leave the country at once, and this opinion on his part would naturally increase the terror which had taken possession of Ernault's mind; and this letter may also shew that the writer had, at the time it was written, acceded in some measure to the notion of personal peril, which Ernault's keen and instinctive sense of danger had so thoroughly embraced on the day the deed was executed. Mr. James Gittings says he (Ernault) was very much frightened; and he also says: "I thought he was a very inconsistent ill-balanced man; but I thought he had sense enough to have some reason possibly for his fright." We might quote at greater length from the testimony; but the citations which we have made are sufficient to illustrate our views of the case.

This young man under the dominion of this overmastering terror disposes of everything he has in the world, amounting in value to a quarter of a million of dollars, and receives in return an annuity of two thousand dollars a year for life, with a power to the grantee to increase the amount of the annuity if he should see fit to do so. To be sure, at his death the property was to be conveyed to his right heirs then living; but his own control over it was gone forever; he could not even dispose of it by will. His heirs would be his own children or descendants, if he should leave any; if he left none, his heirs would be his brothers and sisters, or their descendants; but if none of these were living at the time of his death, his sole heir would be his father. The motive in making this deed was

not to make a settlement for the benefit of his heirs. Such a thing was not within his contemplation. The sole object was to provide a way of escape from a supposed danger, which to his heated fancy threatened his life. This fear directed and controlled all his thoughts and actions. After he had sent a note to Dr. Buckler, for the purpose of inducing him to delay making the communication about his diseased condition, his alarm somewhat abated; that is, he seems to have been relieved from the dread of immediate assassination. But he still continued to believe that the execution of this deed was the only mode of ensuring his safety. He had been an undutiful son in the past, but under the pressure of his embarrassments, he naturally turned to his father and sought his protection, declaring that he was his best friend. We may now see the relative positions occupied by the parties to this deed. On one side was a weak and inexperienced young man, acting under the influence of abject and unreasoning fear; on the other side an able and experienced lawyer, embracing with a calm and intelligent judgment all the circumstances of the occasion; it was a transaction between a son and his father; between a reckless spendthrift and the trustee of his estate. We cannot conceive of more highly confidential relations. The most absolute trust and confidence were reposed in the father; and the law rigorously required him to use that confidence solely for the benefit of his son. He was bound to give his protection in the full measure of the spirit in which it was sought. Lord ELDON has said that, "the language of a Court of justice has in all times been, that if a man does not choose to act upon the confidence appearing in the course of the transaction to be reposed in him, he ought to reject it as soon as proposed." *Huguenin vs. Baseley*. Mr. Williams ought certainly to have reasoned with his son about the folly of the fear which oppressed him, and to have removed it, if possible. He ought to

have remonstrated with him against making so vast a sacrifice of his pecuniary interests; and to have pointed out to him that the deed was not a rational mode of escaping from the difficulties which encompassed him. But neither he nor any one else performed this friendly and necessary office to this helpless young man; and he was permitted to convey away a great estate to accomplish an object, which would never have entered into the mind of a man who was in the free exercise of reasoning faculties. Mr. Williams in his testimony states what advice he gave his son; he says, " at the time or before the execution of the deed, while Mr. Dawson was writing it, he had been so often at this business of projecting deeds that I warned him that he was taking an irrevocable step; that he ought very deliberately to consider it; his reply in substance was, that he knew what he was about and wanted to do it." This was very far short of what the law required, and of what so important a step demanded.

We have seen how very small and inadequate an interest the grantor retained in his own property, by the terms of this deed. But the benefits conferred on the grantee were very great. Without dwelling on the valuable commissions which would accrue to him from the management of so large an estate, we must not forget that the whole of it, with its accumulations, was secured to the other children of the grantee, or their descendants, in case Ernault should die without issue, and if they became extinct in the life-time of the father, it would all go to him. The probability that the father would ever personally receive anything under this deed was very small; but it would be in vain to argue that there was no benefit conferred on the father by the deed. The interests limited to his other children cannot be regarded as matters of indifference to him. If the property went to them eventually, he would be accomplishing one of the great objects for which the great majority of men endure the toils and

struggles of life.   He, himself, if the deed had not been made, would have been entitled to receive the whole of Ernault's personalty which might remain at the time of his death; provided he died intestate, unmarried and without issue.   He had no legal interest in his son's personalty; and very many contingencies might prevent him from getting any portion of it; while, by the deed, both realty and personalty were secured from waste or alienation by the son, and preserved for the persons to whom they were limited.   It is easy therefore to see that the objects accomplished by the deed must have been desirable to him.   But we do not wish to dwell on this consideration; for in reason it can make no difference whether the deed secured benefits to the grantee, or some other person. The injury was the same to the grantor, whose interests he was bound sedulously to protect.   In *Huguenin vs. Baseley*, (14 *Vesey*, 273, 2 *Lead. Cases in Equity*, 1156,) the Lord Chancellor quoted with high approval an observation of Lord HARDWICKE to the effect, " that if a person could get out of the doctrine and principle of this Court, by giving interests to third persons, instead of reserving them to himself, it would be almost impossible ever to reach a case of fraud."

The rights and duties of parties standing in fiduciary relations have frequently been declared by the Courts. The cases have been extremely varied in their circumstances, but there has been great unanimity of opinion in the statement of the principles applicable to them.   We do not purpose to compile the many useful and striking observations made by the Judges on these occasions.   The law is not a mere collection of cases, but a liberal and enlightened science, founded on general principles, which must be applied to the facts in judgment by the rule of right reason.   But it may illustrate the merits of the present controversy, if we consider the mode in which the question in these cases has been stated by eminent jurists.

In the oft-quoted case of *Huguenin vs. Baseley,* where a
voluntary settlement had been obtained by a clergyman
from a widow, who placed great confidence in him, Lord
ELDON thus stated the principle on which the case de-
pended :  " The question is, not whether she, (the com-
plainant,) knew what she was doing, had done, or proposed
to do, but how the intention was produced; whether all
that care and providence was placed round her, as against
those who advised her, which, from their situation and re-
lation with respect to her, they were bound to exert on
her behalf."    And again, in the same case he says:   " I
represent the question thus, whether she executed these
instruments not only voluntarily, but with that knowledge
of all their effect, nature and consequences, which the
defendants Baseley, (the clergyman,) and the attorney
were bound by their duty to communicate to her, before
she was suffered to execute them."    In a later case the
question was thus stated by another Judge of great and
just renown:   " Then, no doubt, he, (the grantor,) was
willing to sign them, (the deeds.)   But our inquiry is, how
was he rendered willing?   Did he become so from the
action of a competent collected judgment of his own, or
from the prudent counsels of friends disposed to consult
his interests?   The evidence clearly proves that Steele
Buffalow, (the grantor,) though not *non compos,* was
always of weak mind, and that it was much impaired.
In the hurried state of his feelings at that time, he could
not judge for himself—he was entitled to the aid of his
friends ; and the defendant ought not to have dealt with
him until he had such aid.   There was no person to propose
terms on the part of the donor, and his interest was wholly
neglected."    These are the words of Chief Justice RUFFIN
in *Buffalow vs. Buffalow,* 2 *Devereux and Battle's
Equity* (*N. C.*) *Rep.,* 252.   Looking at the confidential
relations between the parties to this deed; the great
inequality of the terms on which they stood ; the enor-

mous sacrifice of the pecuniary interests of the grantor; the benefits acquired by the grantee and his other children; and the incapable condition of the grantor at the time of the execution of the deed, we think it our imperative duty to declare it null and void.

Ernault H. Williams within a few months after the execution of this deed returned from Europe, and married the young lady to whom he was engaged. A child of the marriage has been born, and it is contended by the appellant that this child ought to be a party defendant to this suit, for the reason that there is a limitation in the deed to the "right heirs of said Ernault living at the time of his death." It is impossible at this time to ascertain what persons will sustain the relation of heirs to him at the period of his decease; and in the meantime, on the assumption that the deed is valid, the trustee represents all interests in the property conveyed. But if this were otherwise, we do not consider that the rule of proceeding is the same when the validity of a deed is assailed on the charge of fraud, actual or constructive, on the part of the grantee. The issue in such case is *non est factum;* and the deed must stand or fall according to the judgment passed on the transactions between grantor and grantee. In this case the only inquiries relate to the charges affecting the conduct of the grantee, and to them he alone must respond. The contingent-remaindermen are merely volunteers, and their estates must be defeated if the circumstances in which the deed had its origin condemn it. In *Huguenin vs. Baseley*, there were no defendants, except those persons whose conduct was arraigned as fraudulent, and there can be no necessity for bringing volunteers before the Court when this is the only subject of investigation. We should have been much gratified if we could have avoided the discussion of the questions presented by this record. But the obligations of our duty did not permit us to consult our personal feelings. We

have declared the law according to our best judgment, and we have thought that this deed should be set aside; but at the same time we do not believe that the appellant was influenced by any mercenary motives. The law exacts certain requirements of persons situated as he was, and it is our duty to enforce them. At the same time we can see how he might naturally have considered that his son would probably run a rapid course to ruin, unless he were restrained by his father's guardian care; and how he might well have rejoiced at the execution of the deed of trust, which would enable him to curb in a considerable degree the excesses of his conduct. It would probably be a good thing in a moral point of view for many extravagant and dissipated young men of fortune, if their property could be placed in other hands, and an annual allowance meted out to them. Such a proceeding might save them from disgrace and misery. But the law does not permit us to consider this aspect of the question in dealing with this deed. Its validity depends on the considerations which we have stated.

> *Decree affirmed ; the costs in this Court must be paid by the appellant, and the costs in the Circuit Court must be paid by the appellee.*

(Decided 10th February, 1885.)

MILLER, J., delivered the following dissenting opinion in which Judge ROBINSON concurred:

The object of the bill in this case is to vacate and annul a deed executed by the complainant Ernault H. Williams, to his father George Hawkins Williams, the defendant. This deed which is dated the 31st of May, 1882, is very brief and plain. By it, the grantor, in consideration of the sum of one dollar, and other good causes and considerations him thereunto moving, conveys all his estate

and property of every sort and description, to the grantee *in trust* to receive and collect the rents, issues and profits thereof, and therefrom to pay over to the grantor the sum of $2,000 per annum, and no more during his natural life, and to invest and re-invest the surplus, if any, as to the trustee may seem most advantageous, and then, *in further trust* to convey the said property and estate on the death of the grantor, to the *right heirs* of the grantor living at the time of his death. It also contains an irrevocable power of attorney to the trustee to do and perform all and everything in regard to said property which the grantor might or could have done if this deed had not been executed; and it further stipulates that the trustee shall have full power and authority *to increase* said annual allowance to the grantor if it shall seem proper to the trustee at any time hereafter so to do, and that the trustee shall have power to appoint by any instrument in the nature of a will the person who shall succeed him in this trust.

At the date of this deed, the complainant was about twenty-five years of age, and unmarried, though it appears he was engaged, and the marriage was to have taken place a short time thereafter. The property conveyed, real and personal, amounted so far as the testimony discloses, to something over $200,000, most of which the complainant derived under the will of his grandfather, the late John S. Gittings, who died in December, 1879, leaving his will, which was executed in September, 1864. The principal beneficiaries under this will were the testator's nine grandchildren. Seven of whom, including the complainant, were the children of his daughter, Eleanor A. Williams and her husband, the defendant, and the other two the children of a deceased son. Mrs. Williams died in May, 1881, after the death of her father, and in the same year the defendant was, by decree of a Court of equity, appointed in her place sole trustee, under the will of Mr. Gittings, the trust being to receive and pay over the in-

come of his estate to the uses declared by his will, until his grandchildren should respectively attain the age of thirty years, it being his will that none of his grandchildren should have control of the principal given them until they respectively attained that age. It thus appears that the grantee in this deed was not only the father of the grantor, but that at the time of its execution, and for some time before, the relation of trustee and *cestui que trust* in respect to the greater part of the property conveyed by it, existed between them. It is also insisted they occupied the relation of attorney and client, but of this there is no sufficient proof.

The relations, however, of parent and child, and trustee and *cestui que trust*, did undoubtedly exist, and it has been earnestly argued that this fact draws the deed within the familiar principle of equity in reference to transactions between parties standing in fiduciary relations. Lord PENZANCE has stated this equitable doctrine thus: "In equity persons standing in certain relations to one another— such as parent and child, man and wife, doctor and patient, attorney and client, confessor and penitent, guardian and ward—are subject to certain presumptions when transactions between them are brought in question; and if a *gift or contract made in favor* of him who holds the position of influence is impeached by him who is subject to that influence, the Courts of equity cast upon the former the burthen of proving that the transaction was fairly conducted as if between strangers: that the weaker was not unduly impressed by the natural influence of the stronger, or the inexperienced overreached by him of more mature intelligence." *Parfitt vs. Lawless, Law Rep., 2 Prob. & Div.,* 462.

It has been often said that this is a salutary doctrine, and the tendency of the more recent decisions, no doubt, is to extend its application to all the variety of relations in which dominion may be exercised by one person over

another, and to every transaction whereby he who possesses the influence receives any pecuniary benefit from him who is subject to the influence.   The cases in this State are to the effect that a gift obtained where a confidential relation exists, is *prima facie* void, and the burden is on the donee to establish to the full satisfaction of the Court that it was the free, voluntary and unbiased act of the donor.   *Brooks vs. Berry,* 2 *Gill,* 83; *Highberger vs. Stiffler,* 21 *Md.,* 338; *Grove vs. Todd,* 33 *Md.,* 188; *Pairo vs. Vickery,* 37 *Md.,* 467; *Cherbonnier vs. Evitts,* 56, *Md.,* 276.   But it would seem to be clear that there must be some gift, or conveyance, or some bargain, purchase or other business transaction, by means of which the party holding the position of influence acquires property or obtains some pecuniary advantage or benefit, in order to bring this equitable rule into operation.   It cannot in reason be applicable where the deed simply settles the estate and property of the grantor upon *himself for life,* and after his death transmits it to *his own heirs-at-law.*  If a party capable of disposing of his property chooses, for the purpose of protecting it from his own improvidence, or for any other reason, thus to settle it, why should a Court of equity look with suspicion upon the transaction simply because he has made his father or his solicitor the *trustee* in the deed of settlement?   In all the numerous instances in which the doctrine has been applied, no case can be found where such a conveyance has been held to be *prima facie* void.   The authorities are all reviewed in the elaborate notes to the leading case of *Huguenin vs. Baseley* in 2 *White and Tudor's Lead. Cases in Equity,* 1156; and not one of them has gone to the extent of determining that such a deed stands under *prima facie* condemnation. On the contrary, many cases are there cited, in which such settlements are regarded in a very different light.   Many of the English decisions on the subject are reviewed by the *Master of the Rolls* in *Hoghton vs. Hoghton,* 15

*Beav.*, 278, and the rule drawn from them is, that if the settlement of the property be one in which the father acquires no benefit not already possessed by him, and if it be a reasonable and proper one, the Court will support it, even though it may appear that some influence was exerted by him to induce the son to execute it, provided there was no suppression of what was true, or suggestion of what was false ; and among the cases there cited was that of *Tendril vs. Smith*, 2 *Atk.*, 83, in which Lord HARD-WICKE stated the proposition broadly, that "where a father and a child of full age come to an agreement to alter the limitations under a settlement, there is no ground of equity for the child to set aside such agreement, under pretence of being drawn into it by the power and author-ity of the father, and to restore the ancient limitations again," and he referred to a case in *Lord Cowper's* time, where a father prevailed upon a son who was tenant in tail under a settlement, to take an estate for life only, with remainder to his first and every after son, and his lord-ship would not set it aside upon the suggestion of the father's having an undue influence over him. In these cases it did not appear that the father acquired any ad-vantages under the settlements. In *Jenner vs. Jenner*, 2 *De Gex, Fisher & Jones*, 359, where, by the settlement, the son became only tenant for life, instead of remaining tenant in tail, but where the father derived no personal advantage from it, the decision was to the same effect. In *Phillips vs. Mullings, Law Rep.*, 7 *Ch. Appeals*, 244, a young man of improvident habits being entitled to a sum of money, was induced by the trustee of the money, and by a solicitor, to execute a settlement by which he assigned a part of the money to trustees, in trust, to invest and pay to him, during his life, the income on such part thereof as they should think fit, and after his death, in trust, to hold the same for his wife and children, if any, and subject thereto, in trust, for certain cousins of his. He had no

power of appointment in default of issue, and no power of revocation, and no power to appoint new trustees. The deed was explained to him, and the particular clauses were brought to his notice; and it was held the deed could not be set aside by the settlor. Among the cases in this country on the same subject is that of *Hildreth vs. Eliot*, 8 *Pick.*, 293, where a daughter, about to be married, conveyed real and personal estate to her father, in trust, for her separate use, with power of leasing and investing, and to pay over to her, during her life, the rents and income, and also such portion of the principal as he should judge necessary for her convenience and support, or to such person as she should in writing appoint, and after her death to convey the residue and remainder to such child or children as she should leave. The deed contained no power of revocation. The marriage took place, the husband died, and she took a second husband by whom she had children, and then filed a bill to set aside the settlement. But the Court held that no benefit was secured to the father by the deed, and as there was no proof that any undue influence was actually used by him in procuring the settlement, it could not be set aside by the settlor nor by a Court of equity on her application. So again in *Falk vs. Turner*, 101 *Mass.*, 494, it was held that a voluntary settlement by a woman, in contemplation of marriage, of her property in trust for her exclusive use and benefit during her life, notwithstanding her marriage, the trust to be terminable at any time when, in the opinion of the trustee, it should be for her best interest to bring it to an end, but, if it should continue till her death, then the trust fund to be subject to her appointment by will, or in default of such appointment, to be paid to her children then living, and the issue of any deceased child, in equal shares, could not be set aside after the marriage, on the mere ground that the trustee was her confidential adviser, although she was able to manage the property and wished

to regain possession of it; and the Court said the ability of the *cestui que trust* to manage the property, or his desire to do so, has never been recognized as a ground for setting aside a trust; and looking into the terms of the deed we can find nothing unfair or unreasonable which would authorize a Court of equity to interfere within the principle stated in *Hildreth vs. Eliot.* These are some of the cases in which this subject has been considered, and many others to the same effect might be adduced.

Now, in view of these authorities, it would seem to be quite impossible to say that the deed now before us can be brought within the rule which subjects transactions between parties standing in fiduciary or confidential relations to suspicion and condemnation. Upon its face and by its terms the whole property, as well as the entire income from it, is devoted to the grantor himself and to his heirs-at-law, who will be his own children and their descendants, if he leaves any, otherwise his brother and sisters and their descendants. No power is given to apply it to any other purpose, or to any other parties. The trustee can receive nothing by means of it which the law recognizes as a pecuniary benefit or advantage. The contingency of his outliving his six children and their descendants, and becoming heir-at-law of this son upon his death, is too remote and improbable to be taken into consideration. In fact, if contingencies of this character can be looked at, there is more probability that he will lose than gain by the deed, for more than $100,000 of the property is personalty, and this, without the deed, would have gone to him solely and absolutely in case of the son's dying before him intestate and without issue, whereas under the deed it goes, in that event, to the heirs-at-law of the son. The deed interposes between him and any possible chance of his taking any benefit under it, not only the son's children and their descendants, but his younger brother, and his sisters and their descendants. It fixes no

amount of commissions to be received by the trustee, and whatever commissions a Court of equity will allow him for administering the trust can be nothing more than would be given to any stranger who might have been placed in the same position; and the law regards such commissions as *compensation for services* rendered, and not as a *benefit* granted by the deed. Unless then the broad proposition is established that a man can make no voluntary disposition of his estate, except by will only—a proposition which no Court has yet attempted to lay down —it cannot be said that this deed is *prima facie* void. Of course if it was obtained by fraud, by undue influence, by misrepresentation, concealment, or deceit, or under any circumstances, which will justify a Court of equity in setting it aside, there should be no hesitation in annulling it; but here, as in every other similar case, the *onus* of proof is on the party assailing the instrument, and this leads to the inquiry, does the proof in this record make out a case for that relief?

The complainant in his bill charges, in substance, that the deed was procured from him by the unlawful abuse, by the defendant, of the influence which he possessed and exercised over him as father, and of the confidence he reposed in him as his confidential legal adviser; that to accomplish his purpose and obtain the deed the defendant represented to, and advised the complainant that he had power under the will of Mr. Gittings to make such disposition of that part of the estate devised to the children of Mrs. Williams as he might choose, and that complainant was dependent upon his pleasure as to the value of the part of the estate which complainant should receive, and threatened that unless complainant's conduct should be satisfactory to him he would exercise this power to his loss and detriment, which construction of the will complainant implicitly believed to be correct, and did not think of seeking legal advice in respect thereto

from any other source; that for the same purpose the defendant availed himself of certain circumstances, in which complainant was then placed, to represent to him that he stood in great bodily peril, and urged him, in order to escape it, to absent himself from the country, and to place his property and affairs in defendant's hands; that he further represented that unless complainant did so dispose of his property there was great risk and danger of his losing or being deprived of a large part of his estate, and made use of this representation as an additional incentive for the execution and delivery of this deed; that these representations, threats and importunities were persisted in for a long time before they were successful, complainant resisting them with the hope that some other means might be found to avoid the threatened injurious consequences of a refusal; but finally the defendant availed himself of an occasion when complainant, under great distress of mind, brought on by the advice, threats and importunities of the defendant, had indulged in intoxicating drinks to such an extent as to deprive him for the time being of his power to resist these influences, to obtain from him the execution and delivery of the deed, and to induce him to leave the country, in order to escape the dangers with which defendant alleged he was threatened, and under these circumstances complainant yielded and executed and delivered the deed.

The defendant in his answer meets these allegations with an explicit and emphatic denial, and the proof utterly fails to sustain them. In fact, there is not a particle of testimony, not even that of the complainant himself, to support most of these grave charges. There is no proof that Mr. Williams ever threatened to use the power, or supposed power, contained in the will of Mr. Gittings to the detriment of this son, unless he would make over his property to him. On the contrary, when it was suggested by others that he should use it in order to

protect the property from the son's own imprudence, he promptly and firmly declined, saying he would have no inequality among his children. There is no proof that he ever solicited or requested his son to execute this deed. In fact the deed was not prepared until the day of its execution, and the son never saw his father on that day until after it had been prepared by his own order and direction; and moreover the proof is overwhelming that he was perfectly sober during the entire day. With the exception of the son's own testimony, which is wholly unreliable and untruthful in respect to every controverted fact in the case, there is no proof that the father ever requested the son to execute any similar deed of trust whatever. The father in his testimony denies that he ever made any such request, and in this he is supported by other witnesses, and by all the surrounding facts and circumstances. In short, all these charges of threats, representations and importunity are not only unsupported by any reliable testimony, but have been wholly and thoroughly negatived and disproved; and it is manifest that the son, after attaining his majority, if not before, was not under the dominion or influence of his father, and at times did not even treat him with respect.

Much has been said in regard to the mental condition and capacity of the complainant, and what the testimony discloses on this subject is substantially this: In early childhood he suffered from a severe illness, the permanent effect of which was a slight paralysis of one side of his body, and this made him the object of special indulgence, care and solicitude on the part of both his parents. He was wayward, restless, eccentric and timid. Great pains were taken in his education, but in intellectual attainments he was inferior to most young men of his age, who may have had similar or even less educational advantages. But it is clear that he had sufficient natural capacity and intelligence to understand fully the force and effect of a deed

like the present, and when sober was as capable as men generally are, to take care of his property and make valid contracts in respect to its disposition. He had been a clerk in his grandfather's bank and a collector of the rents of his large estate. He had, however, contracted habits of intemperance and dissipation, which had grown upon him in later years, and when he was under the influence of liquor was liable to be imposed upon and cheated. He seems to have been fully conscious of his infirmity in this respect, and as soon as he was entitled to his large property, under his grandfather's will, it became a favorite and persistent idea with him to place it beyond his control so that he could not waste and squander it. At one time he executed an absolute deed, conveying all his property to his mother, but his father was unwilling that his wife, who was then in ill health, should accept such a conveyance or trust, and was furthermore unwilling that at her death the complainant should be made dependent for his support upon his brother and sisters, and he accordingly persuaded him to cancel and destroy the deed before it was delivered, which he did. Shortly before the present deed was executed he had another prepared, containing similar trust provisions, but did not execute it. Assuming then that he was sober, as he undoubtedly was, at the time it was prepared and executed, the testimony discloses no ground for impeaching this deed by reason of any want of capacity on the part of the complainant to comprehend its provisions or to understand its bearing and effect.

Shortly told, the history of the execution of this instrument is as follows: On the morning of the day it was executed the complainant received a letter from Dr. Riggin Buckler, the purport of which will be stated hereafter. On receiving this letter he immediately sought his friend and relative, Mr. James C. Gittings, for advice, and expressed to him his purpose of making a deed of trust of

his property, reserving to himself only $400 a year, and to go at once to Europe. Gittings told him to think the matter over quietly, and when he again spoke of making a deed of trust Gittings told him he ought to talk to somebody else about that. He then went to Mr. Horwitz, a lawyer of high standing and eminent in his profession, and told him he had made up his mind to make a deed of trust of all his property. Some conversation then ensued as to what he desired, and the amount he required per annum. He spoke of being about to be married, and said that in case of his marriage he wished to have the amount increased, and that he wished his father to be the trustee. Mr. Horwitz then addressed a note to Mr. Williams, who was engaged on important business in a distant part of the city, asking him if he would accept the trust, and then proceeded to make a rough draft of the deed in accordance with complainant's wishes, having first persuaded him to have the amount reserved increased from $400 to $2000 per annum. Mr. Williams did not reach his office until some hours afterwards, and then upon learning what had been done, at first declined to accept the trust, but Mr. Horwitz advised him it was his duty to do so, and he then consented. While the deed was being copied by Mr. Dawson, and prepared for execution, the complainant had an interview with his father, and his father then told him he was taking an irrevocable step, and that he ought to consider it very deliberately. His reply was that he knew what he was about, and that he wanted to do it. When the copy was made out it was read over to him by Mr. Horwitz, and he then took it to a magistrate, executed and acknowledged it, and then carried it to the record office and paid for its recording. After this he expressed entire satisfaction with what he had done. He told Dr. Buckler that he had made the deed of his own free will because he thought his father was after all the best friend he had. He expressed the same satisfaction

and confidence in his father to others, and said he knew his father would let him have all the money he wanted. He then went home to his father's house cheerful and contented, dined with the family, drove out in the afternoon with his married sister and her child, made his preparations at night and started the next morning for Europe, being accompanied as far as New York by his friend Mr. Gittings. He took an affectionate leave of his father at the railroad station in Baltimore, wrote him two kindly notes from New York, and another on board the steamer after he had sailed. After he arrived at Kreuznach, in Germany, where he went to take the baths and to be treated for the disease from which he was suffering, he told his courier and attendant, that he had made a deed of trust of all his property to his father, explained to him its character and effect, and said that his reason for making it was that he realized his inability to manage his property himself. It thus appears he was cautioned by his father as to the irrevocability of the deed, and advised by him to consider the matter deliberately. There were no misleading representations made to him, nor any erroneous opinion given as to his rights, as was done in the case of *Wheeler vs. Smith*, 9 *How.*, 55. Nor was there any concealment of the amount and value of the property which belonged to him. The real estate of his grandfather had been valued and divided by commissioners. He had made himself familiar with that proceeding, had obtained and examined the book in which the division was recorded, and knew perfectly well what was coming to him from that source. His father was the executor of the will, and the inventory of the personal estate, and his accounts as executor were on record in the Orphans' Court, and open to his inspection, so that there could be no concealment as to that estate. He therefore had access to every possible source of information on this subject that could be afforded.

But this account of the transaction would be incomplete without noticing the letter of Dr. Buckler, and the effect it had upon him about which so much was said in argument. It appears that he had for some time been under treatment for syphilis, and was then suffering from a severe development of this loathsome disease in its secondary form. Dr. Buckler, who had been his physician, and knew his condition in this respect, was also the physician for the young lady he was about to marry, and knew her well. Learning that this marriage was about to take place, the doctor, having first consulted with Dr. McKenzie, who fully concurred in his view of the matter, wrote the letter in question in order to bring about a postponement of the marriage until the complainant should be thoroughly cured of this disease. In this letter the doctor, after stating that he had heard the complainant was about to marry a young lady, for whom the writer had always felt the kindest interest, says to him: "I am more than surprised that you should, in the face of all that I have said to you on the subject of your contracting a marriage in the present state of your health, take such a step. You certainly cannot be aware of the untold misery you are about to inflict upon an innocent and unsuspecting woman, to say nothing of the wretched, miserable offspring such an alliance will certainly be productive of." He then says he cannot believe the father of the young lady "is aware of your condition. I am sure he never would have consented to your union, and as a friend of his and a well-wisher of his daughter, I shall certainly deem it my duty to waive all professional confidence and write to him at once, and inform him promptly upon this subject, if you persist in your determination. Had you consulted me and seen me when you were contemplating this marriage, I would have insisted upon your delaying it until this fearful poison of syphilis was entirely eradicated from your system. It is not too late now I hope for me to warn you

against taking this criminal step. You must come and see me at once, and if you do not, I tell you very frankly I will either see the young lady's father, or write to him, and acquaint him with every particular concerning your present state of health." This is the letter, and it is proper to say in regard to it that it must meet the approval of every right-minded man, the then condition of the complainant being unquestionably such as the letter states it to have been. The communication of this foul and poisonous taint to a pure wife and innocent offspring is a thing not to be thought of without a shudder, and these eminent physicians were clearly right in thus interposing to prevent the perpetration of such an outrage.

But with the writing and sending of this letter, Mr. Williams, the father, had nothing to do. Shortly before this he was informed for the first time that his son had this disease, and of course concurred in the views of these physicians that the marriage ought to be prevented. The plan then agreed upon, and in which he acquiesced, was that the physicians or one of them should see the father of the young lady in person, and inform him upon the subject. This plan was afterwards changed by the doctors without his knowledge, and the letter to the complainant himself was written instead. The father testifies that he had not the slightest idea that any such letter was to be written, and Dr. Buckler swears that Mr. Williams had nothing whatever to do with it.

The effect of the letter, as might have been expected, was to excite the complainant, and to create in his mind an apprehension that the father or brothers of the young lady would inflict personal violence upon him if his condition was made known as the doctor had threatened, but it communicated nothing that was new to him in regard to his health. He knew perfectly well what that was. He had been repeatedly warned that he was in no condition to marry, and had been advised by his physicians to

leave Baltimore and go to the baths at Kreuznach, which were celebrated for the cure of this disease. He was no doubt much frightened when he received the letter, and when he brought it to his friend Gittings and asked his advice as to what he should do. When Gittings told him he thought it was evidently written by a friend who had his interest at heart, and that every word in it was true, he said, (referring to the lady's family,) they would kill him if they found out the condition he was in. After some further conversation, and after he had expressed his determination to execute a deed of trust and go away, and Gittings had told him he better take it quietly and think the matter over, he suggested an expedient which he thought would relieve him from the difficulty, which was this: He declared that the young lady had often told him that if he made a deed of trust of his property, she would not marry him, and then said, " I will tell her *father made me make this deed of trust,* and now I have but $400 a year, and if she is willing to marry me I will marry her." Gittings then asked if it was possible that he was going to tell her such a lie about it, as that he had been forced to make this deed, and he again said he would make it all right with her ; and it appears he did so, for on his return from Europe on the following September the marriage took place, and before this case was brought to a hearing in the Court below, his wife had borne him a child.

No doubt the letter hastened the execution of the deed, and it is true that his state of fear and alarm continued after he had executed it, and induced, in part, his speedy and secret departure from Baltimore, and the adoption of the indirect route he took to reach New York. It is also true that the position in which he found himself placed was a delicate and difficult one, but it is equally true that this difficulty was brought about solely by his own wilful misconduct, and not in the slightest degree through any

connivance, influence or agency of his father; and, in fact, the testimony entirely fails to show that Mr. Williams did anything he ought not to have done, or failed to do any thing a father ought to have done under the circumstances attending this transaction. The complainant was quite capable of acting for himself in the emergency. What he did was the result exclusively of the suggestions of his own mind, and there was nothing irrational in it. It is manifest from all the testimony that his motive in executing the deed, was first and mainly to carry into effect his long-cherished purpose of placing his property beyond danger of loss through his own reckless dissipation, and secondly, because he thought the deed would be the means of breaking off or postponing his marriage, and would at the same time prevent a disclosure of the state of his health which he was naturally most anxious to conceal. Being thus capable of thinking and acting, and being ready and prompt to act, there was no such overpowering weight of terrifying circumstances surrounding him, and brought about by the receipt of the letter, as will justify a Court of equity in pronouncing the deed not to be the act of a free agent, and least of all is there any proof that it was procured through fraud or undue influence on the part of his father or any one else.

If these views are correct, little need be said as to other criticisms of this deed. The fact that it contains an irrevocable power of attorney adds nothing to its force or effect, and requires no further notice. In some of the authorities absence of a power of revocation in a voluntary settlement, has been relied on as a circumstance creating suspicion of unfairness or undue influence; but such a power would have been out of place in this deed, because it would have defeated the principal object the grantor sought to secure by making it. *Henry vs. Armstrong, Law Rep.*, 18 *Ch. Div.*, 668. A deed which he could revoke at pleasure, would afford little or no protection to his property as against his own improvidence.

It is quite clear that such a deed cannot be set aside merely because the grantor has changed his mind, or because change of circumstances may render it desirable that such relief should be granted, nor because the Court, (if that were the case,) may think it to have been an unwise and improvident act. "Every person," (to use the language of this Court in the recent case of *Goodwin vs. White*, 59 *Md.*, 509,) "whether man or woman, of sound and disposing mind, if under no legal disability, has the absolute right of making any disposition of his or her property that he or she may think proper, provided it does not interfere with the existing rights of third persons. If the disposition of property be fairly made by a competent person, though entirely voluntary and without consideration, it is perfectly valid and cannot be rescinded simply because the Court may think it absurd or improvident that such a disposition should have been made."

The complainant is now married, has a child and may have others, and it would certainly be hard if he should be confined to the $2000 per year out of the income of so large an estate. But there seems to be no good reason to apprehend that he will ever be subjected to this hardship. The power to the trustee to increase the annual allowance was put in the deed for the very purpose of meeting such a contingency, and there is nothing to prevent its liberal exercise. The proof shows that Mr. Williams has been an affectionate and indulgent father to all his children, and especially to the complainant. He has borne with patience, though with weariness and sorrow, the misconduct of his son, and there is nothing in the record to create the suspicion that he will not use his power of increasing the allowance, even to the extent of the entire income, in order that the complainant may live and support his wife and family according to the station in life to which he was born, and to which he has been accustomed.

These are the conclusions, both as to the law and the facts, which I have reached after a careful consideration of the able and elaborate arguments of counsel on both sides, and an attentive examination of all the voluminous testimony in the record. In my judgment there is no ground upon which a Court of equity can rightfully vacate this deed, and I cannot therefore concur in the view of the case taken by the learned Judge of the Court below in his very able opinion accompanying the decree vacating the deed. In my opinion that decree should be reversed, and the deed allowed to stand.