# ELIZABETH C. ROGERS *vs.* ANNA VIRGINIA ROGERS ET AL.

*Trusts—Voluntary Settlement Held Not to be Revocable.*

When a party with full knowledge of the circumstances makes a voluntary settlement of property in trust for the benefit of himself for life with remainder to his heirs at law, the mere fact that the declaration of trust contains no power of revocation or of testamentary disposition does not impeach the validity of the settlement.

A testator gave the residue of his estate to a Trust Company with directions to pay the income thereof to his wife during her life and to divide the property after her death among their children. By a subsequent clause of the will he requested his wife to collect the amounts due under policies of insurance on his life, payable to her, and to put the same in the possession of the Trust Company to be held by it upon the same trusts as those set forth regarding the residue of his estate. After the testator's death his widow collected the amounts of the policies and paid the same to the Trust Company and at the same time executed a declaration of trust setting forth that the money should be invested and held by the company for the purposes mentioned in the will. Fourteen years afterwards she filed the bill in this case alleging that she had paid the money to the company and executed the declaration of trust in ignorance of the fact that she was the real owner of the money collected on the policies and not knowing then that she was at liberty to disregard the request contained in the will, and that the declaration of trust was not her free and voluntary act. The bill prayed that the declaration of trust be cancelled and the fund held thereunder be assigned to the plaintiff as her individual property. *Held*, that since the evidence shows that the plaintiff was fully competent at the time she executed the deed of trust and knew that the policies of insurance were her own property and there was then no fiduciary relation between her and the company, and her purpose in making the settlement was to comply with her husband's request and guard against her own improvidence, she is not now entitled to have the trust terminated and the funds held under it paid over to her.

Appeal from a decree of the Circuit Court of Baltimore City (SHARP, J.), dismissing the bill of complaint.

The cause was argued before McSHERRY, C. J., BRISCOE, PAGE, BOYD, PEARCE and SCHMUCKER, JJ.

*Thomas Hughes*, for the appellant.

*George Whitelock* and *Edward I. Koontz*, for The Safe Deposit and Trust Co., appellee.

PEARCE, J., delivered the opinion of the Court.

Philip Rogers died in 1889, leaving a will dated May 16th, 1888, in which he directed his executor, Alonzo Lilly, Jr., his partner in the firm of Lilly, Rogers, and Co., to convert his entire estate into cash, and after the payment of all charges and debts, to pay over the residue in trust to the Safe Deposit and Trust Company of Baltimore, to be by it invested in sound interest bearing securities, the interest thereon to be paid to his wife, Elizabeth C. Rogers, in equal quarter yearly instalments during her life; the said securities to be equally divided, after her death among their children; with a provision that if there should then be any child or children of a deceased parent they should take, in equal proportions, the deceased parent's share.

The third item of the will lies at the foundation of this case, and is as follows: "Inasmuch as my life has been largely assured, to wit, to the amount of at least $29,500, in various life assurance companies of this country, for the exclusive benefit after my death, of my beloved wife, Elizabeth C. Rogers, provided she survive me, and inasmuch as I have paid comparatively large sums of money, to keep the policies thus assuring my life, alive, I desire that my said beloved wife shall, as soon *as she shall have collected* after my death, *the amounts due to her under said policies*, hand over the same as they are respectively collected to the Safe Deposit and Trust Company of Baltimore, in trust, that the said company may invest the same and dispose of the interest and principal of such investment as is particularly set forth in the second clause of this will." Between the 17th day of January, 1889, and the 21st day of February, 1889, Elizabeth C. Rogers collected from five separate insurance companies the proceeds of five policies of insurance payable to her upon the life of her said husband

amounting to the sum of $29,459.53, and as each policy was paid to her, she paid over the whole amount thereof (less $1,000 reserved from one of said policies for family expenses) to said trust company, and on the 24th day of January, 1889, executed and delivered to said trust company the following declaration of trust:

I, Elizabeth C. Rogers, widow of Philip Rogers, deceased, having delivered and paid over to the Safe Deposit and Trust Company of Baltimore, the sum of seven thousand dollars, received by me from the National Life Insurance Company of Vermont, as the proceeds of a policy of insurance upon the life of my late husband, do hereby declare that said sum has been handed over for the purpose of conforming to the desire expressed by my husband in his will, dated May 16th, 1888, and left for probate in the Orphans' Court for Baltimore City, and do declare that it is my purpose to deliver over to said company all further sums, excepting $1,000 to be reserved by me for family expenses, that may come into my hands from all other life insurance policies, in order that the same may be invested by said company for the trust purposes and upon the conditions and terms set forth in said will, and thus become a part of said trust estate, and do hereby agree to ratify, confirm and accept all the conditions of said will.

Witness my hand and seal this 24th day of January, 1889.

Elizabeth C. Rogers, [Seal.]

Test.       Geo. McCaffray.

—— acknowledged, same day, before Geo. McCaffray, J. P.

On April 18th, 1889, the Trust Co. sent Mrs. Rogers a statement showing in detail the amounts received from her, and the investments thereof. On three occasions since then, advances amounting in all to $450 have been made from the principal to Mrs. Rogers at the request of her children, to relieve her necessities, but the residue of the fund remains intact, invested as shown in said statement, and the net income, less a commission of five per cent thereon, has ever since been regularly paid to Mrs. Rogers. In October, 1902, Mrs. Rogers applied to the Trust Co. for an advance of $2,000 from the principal to be loaned to her son Thornton Rogers, for use in his business as a printer and book-binder, and this being declined by the Trust Co. on the 22nd of October, 1902,

she executed and tendered to the Trust Company, a deed renouncing all interest in the trust created under her husband's estate (which had proved to be only $5.50) and also under the terms of her own declaration of trust, for the purpose of accelerating the vesting of the remainders created by the will and the declaration of trust; and the company declining to accede to the termination of the trust in that way, on the 7th of November, 1902, she filed the bill in this case against the Trust Company and against her own four children, and the four infant children of her two sons praying that her declaration of trust "be cancelled and annulled, and that the so-called trust funds held thereunder may be assigned to her as her individual property."

The bill alleges that at the time of the execution of her husband's will, he read the same to her and reiterated to her his wish expressed therein, in reference to her policies of insurance; that at the time of his death she was fifty-three years of age, wholly unacquainted with business affairs, and accustomed to rely upon and be controlled by her husband in all things; that not understanding or knowing that she was at liberty to ignore his wishes thus expressed, she paid the proceeds of said policies to the Trust Company, and executed to it the declaration of trust upon the request of its president, Mr. Newcomer, but that she never read it, or heard it read, and that it was never in her possession, and that she signed it as a matter of course; that the payment of the proceeds of the policies, and the execution of the declaration of trust were not her free, voluntary, unbiased and unconstrained acts; that she did not know and was not told by any one that there was anything else she could do, or that she was at liberty to treat the proceeds of said policies as her own, and that if she had known this, she would not have paid the money, nor executed the declaration of trust; that said Trust Company occupied a fiduciary relation towards her by reason of its designation as trustee of her husband's estate; that no explanation was made to her by any officer of said company, of the nature of that paper, nor of her rights in the proceeds of said policies, and

that she had no idea she was disposing of her own property in executing the declaration of trust.

It further alleges that the Trust Company was then, and now is, engaged in administering trusts for profit, and that the said Newcomer as president of said company was influenced to procure said declaration of trust in order to secure the control and use of the proceeds of said policies, and that the railroad bonds in which said proceeds were invested were purchased at a high premium from a business firm of which Newcomer was a partner, and that he was also president of one of these railroads.

It further alleged that the declaration of trust contained no power of revocation on her part, no power to devise the fund, and no restriction upon her power to alienate her life estate; but reduced her to the position of an annuitant upon her own estate; that only within the last thirty days she had learned from her nephew and counsel, Herbert A. Smith, that these funds were absolutely hers, and that she was at liberty to ignore and terminate the trust, and that she then applied to the company to consent to its termination, and upon its refusal, filed this bill.

The Safe Deposit and Trust Company answered fully, denying all the charges of fraud, misrepresentation, and suppression in procuring the declaration of trust, and averring that it was executed by the plaintiff with full knowledge of the nature and extent of her interest under the policies of insurance, and of the fact that she was at liberty to conform to, or ignore, her husbands wishes in reference thereto, as she should determine, and that she did in fact disregard his wishes in part, in reserving from said trust, one thousand dollars derived from said policies; that said company never occupied any fiduciary relation to the said Philip Rogers in his life time, nor to his estate, until November 1st, 1890, and then only as to the sum of $5.50-100, being the net amount received from said estate after payment of debts, and that it never occupied any fiduciary or confidential relation, either as trustee or agent for the plaintiff, until after, and by virtue of, the execution of said declaration of

trust; and that the railroad bonds in which the funds were invested were purchased in good faith, at their full market value, and were then worth from ten to fifteen per cent more than when purchased. That after the death of her husband, his executor brought her to the company's office and introduced her to its vice-president, Mr. Marshall, who introduced her to its president, Mr. Newcomer since deceased, to whom she stated her purpose to carry out the wishes and request of her husband as expressed in his will, and voluntarily and deliberately executed the declaration of trust, prepared at her request, and with full and explicit knowledge of its contents, purpose and effect; and that the trust thus created was irrevocable by reason of the contingent interests thereby created, either by the plaintiff's renunciation of her life interests under said trust, or by any decree of Court.

The plaintiff's four children answered, consenting to the decree prayed, and the infant children of her two sons answered by their guardian submitting their rights to the protection of the Court.

A large amount of testimony was taken, and after full hearing the bill was dismissed, and from that decree this appeal is taken.

There is no allegation in the bill of any mental incapacity on the plaintiff's part, but three of her children, who were then aged respectively, twenty, eighteen, and twelve years, testified that when the declaration of trust was executed she was incapable of executing a valid deed or contract; their opinion being based entirely upon the fact that she was inexperienced in business and greatly distressed by her husband's death.

Dr. Sellman, who was the family physician, during Mr. Rogers life, and ever since, testifies that she was then just as capable of transacting business as she ever has been and that in his judgment she was perfectly competent to execute a valid deed or contract; and Mr. Lilly, the executor, who had known her many years, and Mr. West, who had been with Mr. Rogers in his business since 1872, unhesitatingly say she was perfectly competent for that purpose. We may therefore safely dismiss

this question without further comment, except to remark that
the testimony of all the children confirms that of Mrs. Rogers,
that her husband's disposition was a very lovely one, that he
was always kind and considerate of her, granting her wishes
in every way in his power, and in the language of Thornton
Rogers, "never seeking to coerce her, but treating her in all
respects as his equal."

The plaintiff's own testimony cannot be read without pro-
ducing the conviction that she is a woman of strong mind and
great caution, and it is due to her to add that a regard for
candor and truth is apparent in all she says.

Upon her examination in chief, she stated that when her
husband executed his will, he gave it to her to read, and after
she had read it, repeated his wish that she should deliver the
proceeds of her insurance policies to the Trust Co. as requested
in the will, and asked if she was satisfied with the will, and that
she said she was, but she would like to continue to carry
on the drug business, but he said—"Let the Rogers girls be a
warning to you." These were his brother's children who tried
to carry on their father's business and lost everything. She said
she supposed her husband had entire control over these policies;
that his request was his will and she had to abide by it; that
the declaration of trust was given her to read, and she signed
it as a matter of course, without any explanation from any one
of her rights in the matter; that she was never told, and never
knew, until a short time before filing this bill that she could
have ignored her husband's wishes in this regard; and that
if she succeeded in this suit she intended to let her son, Thorn-
ton, have $2,000 and to make a will so that her own children
should have the interest on the whole fund for life, and the
principal go to their children on their death.

On cross-examination she said she read the will only once
in her husband's lifetime, when he showed it to her, but after
his death read it a number of times; that during his last ill-
ness she told him again she would like to carry on the drug
business, and he replied "No, no. Let the Rogers girls be a
warning to you;" that she went with Mr. Lilly to the office

of the Trust Company and the declaration of trust was executed there, but she could not remember who was present, or whether she went more than once before its execution, or anything that was said about its execution; that they just gave it to her to sign, and she thought she had to sign it; that she had no recollection of making any proofs of loss, though she knew several policies amounting to $29,500 were payable to her, and that she was quite sure she had received no money or checks for any of these policies, and had paid no money, and endorsed no checks to the Trust Company. She said she did not know when, or by whom, the declaration of trust was suggested or prepared, but she admitted it was handed her to read, and she supposed she read it, since as far as she knew she had never signed any paper without reading it; that she knew these policies were, as stated in the will for her "exclusive benefit" and that this meant "entirely and absolutely" for her, so that after his death they were hers; that she understood a request was not an imperative command, and that no one told her she had no control over the policies, but that she "thought that was the thing for her to do;" that Mr. Newcomer died about April, 1901, and that she never raised any question during his life as to the validity of the trust; that she could not say who showed the will to Mr. Marshall or Mr. Newcomer, and that she could not recollect any conversation on the subject with either; that she does not charge that either of these gentlemen in any way misled her, or made any representation to induce her to execute the paper; that she did not charge Mr. Lilly, or any one, with misleading her or influencing her in the matter, but that if she had known she could have controlled the money, she would have acted differently; that she could not remember telling Mr. Marshall that she had always been glad she had complied with her husband's request in reference to these policies, and never wished the investments disturbed, and was quite sure she did not do so; that she could not recollect that Mr. Newcomer told her it was optional with her to make the trust; that she could not explain how it was that $1,000 was reserved from the operation of the trust,

but that she did not suggest it, and that when these proceedings were authorized she left everything to her counsel, Mr. Hughes, and that she executed the renunciation of her life interest under the trust, in favor of her children because she supposed that was the right way to go about the matter, and that she did it freely and voluntarily for that reason, and because her children requested her to do it.

It thus appears that it was only after the lapse of fourteen years from the death of her husband, after the death of Mr. Newcomer with whom alone the transaction was conducted, and after the failure of her son to obtain from the Trust Company, the advance sought, that she expressed any dissatisfaction and was induced to take these proceedings. It is also to be observed that she has forgotten almost everything which the testimony shows occurred at that time, such as the making of the proofs of loss by her, the receipt of checks payable to her order for the proceeds of her policies, their endorsement by her to the Trust Company, and her subsequent declaration to Mr. Marshall that she was well satisfied with what had been done, and under no circumstances wished her investments disturbed.

Mr. Lilly testified that the policies payable to Mrs. Rogers were kept at her house and were never in his possession; that he collected only the policies payable to him, and to the estate, and that he had no connection with the proofs of loss under her policies, nor with the payment or transfer of their proceeds to the Trust Company; that he went with her to the Trust Company's office on her first visit, introduced her to Mr. Marshall, and stated the purpose of her visit, but did not see Mr. Newcomer and had no knowledge of the execution of the declaration of trust, or of what was said at that time; that Mrs. Rogers asked no questions of him as to her right to control these polices, and was thinking only of one thing, the security for her investments and complying with the terms of the will.

Mr. Marshall testified that Mr. Lilly introduced Mrs. Rogers, and handed him a copy of the will, stating that Mr.

Rogers' estate would be practically nothing; that after reading the will he introduced Mrs. Rogers to Mr. Newcomer and communicated to him the information received from Mr. Lilly; that he could not recall any details of the interview between Mr. Newcomer and Mrs. Rogers, but the result was that Mr. Newcomer prepared a draft of a declaration of trust to be executed by Mrs. Rogers, a copy of which remained in Mr. Newcomer's portfolio several days before it was executed; that the only compensation received by the Trust Company was a commission of five per cent upon the income, and that when Mrs. Rogers in 1894 asked for the small advances then made, she said she never wanted the bonds disturbed, and had always been satisfied and glad that she had set aside these funds to conform to her husband's wish.

With this outline of the testimony, which we have felt to be necessary to a proper understanding of the case, we may consider the legal principles to be applied. The position of plaintiff's counsel is that the doctrine of fiduciary relations "extends to dealings between husband and wife," and that in all transactions between persons occupying such relation "equity raises a presumption against their validity which can only be overcome, if at all, by clear evidence of good faith, full knowledge, and of independent consent and action," as laid down in *Pomeroy's Equity*, sections 956, 957 and 963; and he cites in support of this position the case of *Livingston* v. *Hall*, 73 Md. 397, in which the Court said that "a gratuitous conveyance by a wife, of her property to her husband will be held void, unless it affirmatively appears from the attending circumstances, or otherwise, that it was her voluntary act, free from any undue influence exercised by her husband." Conceding this statement of the law to be correct, it cannot have the controlling effect assumed by plaintiff's counsel, for whatever influence Philip Rogers may have possessed over his wife, it is certain from her own testimony that he did not seek to exert it unduly during his life. He never mentioned the subject of this trust to her, until he handed her his will for her examination, and he couched the reference therein to her own policies of insur-

ance, in the language of request, and laid stress upon the fact that these policies, as she already knew, were for her "exclusive benefit." It must be observed that he exacted no promise from her to comply with his request, and that his question whether she was satisfied with the will, and her answer that she was, would have been equally appropriate, if no request as to her policies had been made ; and that, logically, the inquiry as to her satisfaction must refer rather to what *he had done*, than to what *he had requested her to do*. But conceding, as we must, that this request was embodied in the will in order to give it a moral force which it might not otherwise have, the case is not brought within the principles above invoked, because there was no "dealing between husband and wife ;" no "transaction" between persons one of whom occupied a fiduciary relation to the other, and which "transaction" could be made the subject of rescission by the Courts. The only influence which could be exerted over her by her husband's request, when she was called on to act in the matter, was the silent, powerful, and sacred influence which the last request of a wise and devoted husband, made in the truest interest of herself and their children, ought to exert over an equally devoted wife.

Referring to the case of *Huguenin* v. *Basely*, 14 Vesey, 290, so often quoted in cases of this character, there was nothing withheld from Mrs. Rogers by her husband which he was bound to communicate to her. She has testified she knew these policies were absolutely hers and the will so declares. She knew that the effect of creating this trust would be to substitute a life estate for her absolute estate, and she knew that her husband's motive in advising and requesting as he did, was to guard her against misfortune and to preserve to her throughout her life, the fund for the accumulation of which he had toiled so long, and in doing which he had reduced his own estate to practical insolvency. He never again referred to the request made in his will. In his last illness however, she did, again expressing her wish to continue the drug business, and his only reply, not in the language of command or of authority, but of affectionate expostulation, was,

"No. No!  Let the Rogers girls be a warning to you."  No trust was executed during his life, and she had nearly a year for reflection upon his request, undisturbed by any importunity or solicitation upon his part, before he died.  He left his request to repose during the remainder of his life, and after his death, upon the foundation upon which alone it was originally rested, her own confidence in the wisdom of his judgment and the disinterestedness of his motives in making the request.  Can there then be any doubt as to how her intention to comply with this request, was produced?  Can it be attributed to anything else than her own fixed purpose, with full knowledge and understanding of the nature, effect, and consequences of the act, to adopt his advice and fulfill his request? He secured no benefit or advantages through the declaration of trust, other than the assurance, if knowledge of earthly things can penetrate the veil of death, that thereby she would be secured against her own inexperience, against her own possible improvidence, or the importunity of her children in the future; while they would be equally protected in the ultimate enjoyment of that, which though legally hers in the fullest sense, came exclusively from his exertions, and partook of all the essential qualities of a patrimonial estate.

Nor can we find that the Trust Company bore any fiduciary relation *to her* until after the execution of the declaration of trust.  It had not even accepted the trust created by the will as to the testator's own estate, until November 1st, 1890, nearly two years after the execution of her declaration, when the $5.50 which constituted the whole estate was turned over to it.  Mr. Lilly had advised Mr. Marshall, in Mrs. Rogers' presence, that her husband's estate would be practically nothing.  She came voluntarily to the company, bringing a copy of the will, for the express purpose of fulfilling its request. The will declared these policies to be exclusively for her benefit, and there could be no obligation resting upon the company to attempt explanation of a fact which was patent upon the face of the will, and which it must be presumed was as plain and clear to Mrs. Rogers' intelligence as to that of the

officers of the company.   It secured no advantage under the declaration of trust which does not even provide for any commissions, leaving these to be regulated by custom, or by order of Court.   But if it had conferred a right to a fixed commission, this would not have altered the case, since it was held in *Brown* v. *Mercantile Trust Co.*, 87 Md. 392, that the law regards reasonable commissions as compensation for services rendered, and not as a benefit granted by the deed.   It is true that whenever any one proposes to divest himself of rights and constitute a trustee whose duty it may become to enforce a trust thus created, full opportunity should be given for consideration before taking such irrevocable step.   Here there was no undue haste, for though the declaration of trust was prepared by Mr. Newcomer at the first interview with Mrs. Rogers, Mr. Marshall's uncontradicted evidence is that it was not executed until several days later.

Under these circumstances then can it be said that this declaration of trust is *prima facie* void, and that the burden is on the trustee to establish to the full satisfaction of the Court that it was the free, voluntary, unbiased act of the grantor ?   We think not.   In *Williams* v. *Williams*, 63 Md. 405, JUDGE MILLER, with the concurrence of JUDGE ROBINSON, said, "It would seem to be clear that there must be some gift, or conveyance, or some bargain, purchase, or other business transaction, by means of which the party holding the position of influence, acquires property, or obtains some pecuniary benefit or advantage, in order to bring this equitable rule into operation.   It cannot, in reason, be applicable where the deed simply settles the estate and property of the grantor upon *himself for life*, and after his death transmits it to *his own heirs at law.* If a party capable of disposing of his property, chooses, for the purpose of protecting it from his own improvidence, or for *any other reason*, thus to settle it, why should a Court of equity look with suspicion upon a transaction simply because he has made his father or his solicitor the trustee in the deed of settlement?   For the purposes of the case before us we might have omitted the last line of the passage we have repro-

duced, which goes farther than is necessary in this case, where as we have shown no fiduciary relation existed between the settlor and the trustee, but we have preferred to quote the passage in full.   With regard to it, we may repeat here what was said in *Brown* v. *Mercantile Trust Co.*, *supra*, in reference to a passage from the same opinion : "This was part of a dissenting opinion it is true, but there is nothing in the opinion of the Court in conflict with it, and the utterance of so able and experienced a Judge, concurred in as it was by the late CHIEF JUDGE ROBINSON, is undoubtedly entitled to great considera-tion."   We find nothing in the opinion of the Court in that case in conflict with the passage we have cited though the Court refused to apply the view of the law there expressed, to the case before them, on the ground that the deed in that case provided that in certain contingencies the whole estate should go to the trustee who was the grantor's father, and in referring to this, JUDGE BRYAN said, "It would be in vain to argue·that there was no benefit conferred on the father by the deed."   With this expression of the Court, and with its conclusion upon the whole case, we are in full accord and have referred to the opinion of JUDGE MILLER only as applicable to the facts of the present case.

We do not regard the absence of a power of revocation, or of testimentary disposition as requiring any consideration in this case.   As has been said, "There is a class of voluntary settlements to which powers of revocation are appropriate, and another class to which they are not, and it is fairly well settled that each case depends, in this regard, upon its own facts."   We think this case falls within the latter class.   If Mrs. Rogers understood her rights in the matter, and executed the declaration of trust with the deliberate purpose of conforming to her husband's request, it would have been as clearly out of place, although for different reasons, to have inserted a power of revocation as this Court said it would have been in *Brown* v. *Mercantile Trust Co.*, *supra*, where his purpose was to protect himself from his own improvidence.   Nor can the absence of a power to make testamentary disposition constitute any

valid objection, since the deed transmits the property after her death to her heirs at law, and thus leaves its devolution where the law would have carried it if no trust had been created and she had died intestate.   In *Whitridge* v. *Whitridge*, 76 Md. 85, the Court said : "It is highly improvident for a young woman, just twenty-one, and about to be married, to divest herself by deed, forever and irrevocably, of all title to and control over her property without the slightest reference to or provision for any of the contingencies which might arise in the future in the new relation of life upon the threshold of which she stands.  It is equally improvident in one so circumstanced to surrender by such a conveyance all testamentary power over the bulk of her estate, save the right to appoint among persons of a designated and selected class, to tie it up beyond recall, and to abandon all participation in its investment."

But what would be unwise and improvident in such a case, is far otherwise in a woman of fifty-three, unaccustomed to business, deprived by death of the daily counsel and aid of her husband, possessed only of a moderate competence provided by his frugality and toil and with infant children to be reared and educated.   In such case, every consideration of prudence and sound judgment would dictate the adoption of some plan by which her little store might be guarded against the misfortunes which lie in wait for inexperience, and might be preserved intact for her and her children.   She stood, not upon the threshold of a new life, but over the ashes that lay cold and gray upon the hearthstone of the sundered family, and no wiser or more provident course could have been pursued than that pointed out by the affectionate solicitude of her husband.

The law applicable to cases of this character has been so fully and ably considered in the long line of cases in Maryland, and notably in the recent case of *Williams* v. *Williams*, 63 Md., *Whitridge* v. *Whitridge*, 76 Md. and *Brown* v. *Mercantile Trust Co.*, 87 Md., that there can be no excuse for protracting this opinion by any further discussion.

If the testimony in this case satisfied us that Mrs. Rogers

did not know that she had absolute control over these policies, and believed that she had no power to refuse to execute the declaration of trust, and would not have done so but for such belief, we should feel constrained to declare the deed a nullity, however disastrous the consequences to her. But we cannot reconcile her statement to that effect with the prevading evidence of her general intelligence, quick perception, and marked caution in dealing with legal papers during her long examination as a witness ; with her apparent satisfaction with her action throughout fourteen years, and with her declaration to Mr. Marshall of this satisfaction. We are not to be understood as questioning her sincerity, for throughout that trying ordeal her desire to state only the truth was made apparent. But she has been subjected to the most powerful of all influences to maternal affection, the importunity of children, who having grown to manhood, are now experiencing the responsibilities that attend meagre incomes, and the exigencies of business competition, and have become weary of waiting for the distribution which would relieve present necessities, and enable them to enlarge their sphere of operations. Mrs. Rogers' infirmity of memory is shown by her complete forgetfulness of all the circumstances attending the collection and transfer of the proceeds of these policies as established by other evidence, and of the circumstances attending the execution of the declaration of trust, and this forgfetulness leads us irresistibly to conclude that she has also forgotten, what she indeed practically admits in one breath, while in the next she denies it, that she knew these polices upon her husband's death belonged absolutely to her. In this case, as in many others the wish is father to the thought, and under pressure from loved ones generates belief. Protection against oneself is sometimes more needed than against others, and when this is shown to be the case, it is our duty to extend it, if we can lawfully do so.

For the reasons we have given the decree of the Circuit Court will be affirmed.

*Decree affirmed with costs to the appel-*
*lee.*

(Decided July 1st, 1903.)