# CIRCUIT COURT NO. 2 OF BALTIMORE CITY.

Filed September 2, 1913.

ALICE WILKINS VON BUCH-
WALDT, PLAINTIFF,
VS.
GUSTAV A. SCHLENS, TRUSTEE,
ET AL., DEFENDANTS.

*Johannsen and Powell, Stinchcomb and New* for plaintiff.
*Slingluff and Slingluff, Ritchie, Janney and Griswold* for defendants.

GORTER, J.—

The object of this proceeding is to set aside a deed of trust made by Alice Wilkens. While the deed is dated October 8, 1900, it did not become operative until January 27, 1901, and was not recorded until February 1, 1901.

## 1. THE DEED OF TRUST.

By this deed Alice Wilkins conveyed an estate of two hundred and fifty thousand dollars, of which she was the absolute owner, to the defendant, Gustav A. Schlens, her great uncle and brother-in-law, in trust, to receive during her life the net rents and profits, with the remainder to her children or issue, with the power to will should she die without children or issue; and in case of her death intestate without children or issue, the property to pass to those entitled as heirs or next of kin, under the laws of the State of Maryland. By the deed she had the right to purchase a homestead, with the written approval of her trustee. The trust was required to be administered under the jurisdiction of the Court. The deed also provided that in case of the resignation, removal or death of the trustee, the Court which has assumed jurisdiction of the trust shall appoint such person or persons as his successor or successors as she should recommend.

## 2. WILLIAM WILKINS' FAMILY AND WILL.

William Wilkins, the father of Alice Wilkins, resided for many years in Baltimore County, just beyond the then Western limits of Baltimore City, where by his enterprise and industry he accumulated a large fortune. He was married three times. By his first wife he had three children, Henrietta, who married Gustav A. Schlens, William and Charles. By his third wife he had three children, Anna Maria, Alice and Christian. He died July 12, 1879. His will was made on April 18, 1876. His two youngest children, Alice and Christian, were not born when his will was executed. Alice was born October 6, 1877, and Christian, April 16, 1879.

By his will, after confirming the marriage settlement with his last wife, and after making a number of special bequests, he directs that the rest and residue of his estate shall be divided into so many shares as he has children.

(a) The Share of Henrietta. To his daughter, Henrietta, wife of Gustav A. Schlens, he gives one share absolutely.

(b) The Share of William. To his son William, he gives one share for life, with remainder to his children or issue, with power to William to fix by will the shares of his children or issue, and in the absence of the exercise of such power to them equally per stirpes; with power to William to will to his widow not more than one-fourth of said share if issue, and not more than one-third if no issue, and in the absence of the exercise of such power, then to the widow one-fourth, if issue, and one-third if no issue. If William should die, then the share, less the widow's portion if one, goes to the other children of the testator.

(c) The Share of Charles. One share he gives to trustees, to pay to Charles during his life such part of the income as the trustees shall see fit, not less than one thousand dollars for one year, "without power to the said Charles to alien or anticipate said income," with remainder to such child or children or issue thereof who shall attain twenty-one years of age. If Charles marries with the consent of the trustees, his widow is to get one-third of the share. If he marries without their consent, she is only to get such portion, not exceeding one-fourth, as the trustees shall see fit to give her. The trustees can appoint their successors in the trust.

(d) The Share of Anna Maria. One share he gives to three trustees, of which Gustav A. Schlens is one, to apply so much of the income as may be necessary for the maintenance and education of Anna Maria, the money to be given to her mother, the accumulations to be added to the corpus. Upon Anna Maria arriving at age, the income is to be paid to her during her natural life, for her sole and separate use without power to her to alien or anticipate her income. Upon her death the principal of said share to her children. If she die without issue, one-half of said share is to go to her mother absolutely, if her mother survive her, and the other half to the issue of the testator per stirpes, or all to them if her mother do not survive her. The Trustees are given the usual power as to investing and are authorized to appoint their successors in the trust.

(e) The Share of Alice and Christian. We now come to the clause in the Will in regard to after-born children, under which Alice Wilkins took the property covered by the deed of trust in controversy. It reads as fol-

lows: "And if it shall happen that any other children shall be born to me hereafter who or their issue shall be living at the time of my death, then I give and devise to each such child, or his or their representative issue, one of said equal parts or shares into which my residuary estate shall be divided, as aforesaid, provided such child or the issue living at the time of my death, of any such hereafter-to-be-born child then deceased, shall live to attain the age of twenty-one years. And I empower my executors to expend so much as they shall deem requisite of the income of the contingent share or shares of such hereafter-born child or children, or issue aforesaid, during their respective minorities, in and towards their maintenances and support respectively; and in the case of the death of such hereafter-to-be-born child of mine or of all the issue of such deceased child, as aforesaid, under the age of twenty-one years and without issue, then I limit or give the part or share of my estate which such child would have taken if living to the age of twenty-one years in the same manner as hereinbefore provided in respect to the part or share of the said Anna Maria, in case of her dying without issue, as aforesaid." Herman H. Grane, Louis Wilkins, his brother, and his son-in-law, Gustav A. Schlens, were appointed executors.

### 3. HISTORY OF ALICE WILKINS DURING MINORITY.

In 1880, one year after the death of her husband, Catherine Wilkins returned to Germany, taking with her her three young children, Anna Maria, Alice and Christian. In 1885 Catherine Wilkins married Erdmann Schubert, who is now a General in the German Army, and by him has had one daughter. When Catherine Wilkins returned to Germany she resided at first for three or four years in Bremen, she then removed with her children to Dresden, where the family continued to live until Alice attained her twenty-first year, which she did on October 6, 1898. Anna Maria married Martin von Bose in 1894.

### 4. CONTEST AS TO THE CONSTRUCTION OF THE CLAUSE OF WILLIAM WILKINS' WILL.

When the time approached for Alice to reach her majority the question arose in the mind of Mr. Schlens as to the meaning of the above quoted clause in the will of William Wilkens, under which Alice and Christian took their shares of their father's estate. The letter of July 14, 1898, from Mr. Schlens to Mrs. Schubert explains the condition of affairs at the time:

"Dear Catherine: In October Alice will be twenty-one years old and of age, and now the question comes up how her estate shall be handled, as it does not say positively in the testament. The legal way is that lawyers be engaged to represent both sides, one for Alice and one for the Trustees. The lawyers take the testament into Court. Each of them represent their side and then it will be left to the judges to say what was the intention of the testator. Such proceedings, of course, cost a great deal of money and Alice's estate would have to pay all. I have now had a conversation with Mr. Slingluff, the attorney of the estates, and it is his view that the judges would decide that it was the intention of the testator to treat Alice's estate in the same way as her sister Mamie's, that is, that the estate should remain in the hands of trustees for their management, but Alice would be entitled from her twenty-first birthday to receive the net income from her estate. In order to evade the considerable and no doubt useless expenses of such a lawsuit, there is another way, namely, that Alice by her own free will, declares that she would be satisfied that her estate be treated in the same way as the estate of Mamie, namely, to remain in the hands of the trustees for management and that Alice receives the entire net income. Please talk this matter over with Alice and let me know the result. If Alice is satisfied, I will have the legal documents made up and sent over for her signature. With heartfelt greetings.

AD. SCHLENS.

We have not the reply of Mrs. Schubert to this letter, but the letter of Mr. Schlens to her, of August 17, 1898, indicates that his suggestion that the will left Alice's share in trust, or that Alice should put it in trust, was received by Mrs. Schubert with considerable irritation if not resentment. This letter explains why Mr. Schlens was compelled to take the position that he did, and sets forth the advantages of Alice's estate being held in trust.

Mr. Schlens' letter of September 25, 1898, shows that all had concluded to leave the construction of the clause to the Court to determine whether Alice's share in her father's estate was hers absolutely, or held in a like trust to that of her sister, Mamie. The result of this litigation was that the Court of Appeals in July, 1899, decided that Alice held her estate absolutely free of any trust. The decision is reported in the case of Schlens vs. Wilkens, 89 Md. 582.

## 5. ALICE WILKINS' KNOWLEDGE OF THIS LITIGATION.

We find the matter of the litigation referred to in Mr. Schlens' letters to Alice of March 29, 1899. He writes: "The suit with reference to the testament is pending. It now goes to the Court of Appeals, and will hardly be decided before July." Again in his letter to her of May 22, 1899, after giving her a statement of her estate, and inviting her over to take a look at things for herself, he refers to the then pending suit, saying he hardly expected a decision before July. In his letter of July 7 to Mrs. Schubert he informs her of the decision of the Court of Appeals; and in his letter of July 22, 1899, to Alice, he writes: "As you have no doubt been informed by your Mama, the highest Court of the State of Maryland has decided that according to the letter of the testament you are entitled to receive your share upon arriving at the age of 21 years." The subsequent correspondence shows that the lawyers made a charge against the estate of Alice of $5,000 for their services in the suit; which after considerable controversy was compromised for $3,500.

## 6. THE ENGAGEMENT OF ALICE WILKINS AND HER MOTHER'S OPPOSITION.

On Alice Wilkins' twenty-first birthday, October 6, 1898, her engagement to Christian von Buchwaldt, a lieutenant in the German Army, was celebrated at the home of her mother in Dresden. Her mother and family were at first very much pleased with the engagement. But soon after the announcement, Mrs. Schubert began to hear rumors that reflected upon the character of her prospective son-in-law. The nature of these rumors the evidence discloses. The result was that a fixed and bitter opposition to the marriage of her daughter took possession of Mrs. Schubert, and continued unabated until her daughter's marriage more than two years later. Alice, who in all other matters had been a most obedient daughter, refused to break her engagement with Lieutenant von Buchwaldt. The consequence was most unpleasant and painful interviews between her and her mother, which finally culminated in December, 1900, when Alice, a few days before Christmas, left home and went to pay a visit to the parents of her fiance, at Glucksburg, where she was afterwards married, on April 18, 1901.

## 7. THE TRIP TO AMERICA AND THE SIGNING OF THE DEED OF TRUST.

In the spring, or early summer, of 1900, Alice's sister, Mamie, and her husband determined to visit America. Shortly before they started Alice made up her mind to accompany them. They arrived in New York in August, and after a sojourn there for a few days they, came to Baltimore and stayed at the house of Mr. Schlens. After a visit there of a week or ten days they left for a trip to the West. On their return from this trip they again visited Mr. Schlens, arriving at his home the latter part of September. The subject of Alice making some disposition of her property so as to protect it in case her marriage turned out unfortunately, was first spoken of to Mr. Schlens by Mr. von Bose. Mr. Schlens then had a talk with Alice on the subject. In furtherance of this object they proceeded to the office of Mr. Slingluff, Alice, Mamie, Mr. von Bose, Mr. Schlens and William Wilkins, Alice's half brother. There they met Mr. Fielder and Mr. Lee Slingluff. The matter was there discussed, and a deed of trust was directed to be drawn up. The deed was prepared and a few days afterwards, on the 8th of October, Alice and Mr. Schlens returned to Mr. Slingluff's office, where Alice signed and acknowledged the deed. These are the facts as testified to by Mr. Schlens, Mr. Fielder Slingluff and Mr. Lee Slingluff, who drew up the deed. That Alice visited the office of Mr. Slingluff twice is shown by the testimony of Mamie, who said she was not present when the deed was signed; that she went to pay a visit to the Knabes that afternoon.

## 8. THE RETURN HOME AND THE CABLE TO RECORD THE DEED.

Although the Deed of Trust was signed and acknowledged on October 8, 1900, it was not to become operative unless Alice, after consultation with her mother, upon her return home, should determine that it should be, in which event she was to cable Mr. Schlens to record the deed. Shortly after the 8th of October, Alice, Mamie and Mr. von Bose sailed for home, where they arrived the latter part of the month. Alice continued to live with her mother until just before Christmas, when she went to visit the home of Mr. von Buchwaldt's parents. While there she sent on January 27, the telegram that has been offered in evidence, directing the deed to be recorded. On February 1, 1901, Mr. Schlens put the deed on record.

## 9. THE DEED IS ATTACKED ON TWO GROUNDS.

1st. That Alice Wilkins at the time she signed the deed and at the time she cabled directing its recording believed that she could at any time revoke the deed, and that if she had not so believed, she would not have made it.

2nd. That the Deed was not her free, voluntary and unbiased act, but that against her will she was coerced by the resistless importunities of her mother to execute the deed.

*First—Did Alice Wilkins know when she made the Deed that it was irrevocable?* I cannot escape the conclusion that she did.

(a) *Alice Wilkins was at the time a matured woman.* When the Deed was signed, Alice Wilkins was a woman of twenty-three years of age and possessed of ordinary, if not, as indicated by her letters, of unusual intelligence.

(b) *The litigation. Alice was familiar with the nature of an irrevocable trust.*

The estate of her sister Mamie, a few years older than herself, and a share equal to her own, had been left in trust by the will of their father, William Wilkins. When Alice arrived at age the question arose, which from its nature must have deeply impressed her, as to whether under her father's will her share of his estate should be held in trust as her sister's was, or

whether it belonged to her absolutely. The correspondence between her mother and Mr. Schlens on this subject, shows that her mother resented with some heat the construction put upon the will by Mr. Slingluff, that Alice's share was tied up in a trust like Mamie's. It is but reasonable to suppose that this matter must have been called frequently to Alice's attention. In one of her Uncle's letters to her mother he suggests that Alice make a deed placing her property in the condition of Mamie's, and thereby avoiding the expense of litigation to determine the meaning of the clause of William Wilkins' will, under which Alice took her share of his estate. Mrs. Schubert and Alice were unwilling to follow the advice or suggestion of Mr. Schlens, in regard to Alice placing by her own act her estate in trust, and so the question was taken to Court. This question as to whether Alice's share in her father's estate was an irrevocable trust was carried through the Courts, and decided by the Court of Appeals in July, 1899. For this litigation the attorneys engaged made a charge of five thousand dollars, which was afterward compromised for three thousand five hundred dollars in April of the following year. So that, from July, 1898, when the matter was first opened by Mr. Schlens in his letter to Mrs. Schubert, until April, 1900, when the counsel fees were settled, nearly two years, the subject of Alice's estate being held in trust like that of her sister, or belonging to her absolutely, was before the minds of Alice and her mother. In addition to the importance of the subject itself, the expense of the litigation would tend to impress the matter deeply upon them. Could there be a stronger object lesson both to Alice and her mother, of the nature of an irrevocable trust, than that afforded by Mamie's trust, and the litigation to determine that Alice's share was not under a similar trust?

(c) *The testimony of Mr. Schlens and the Slingluffs.* Nor can the testimony of Mr. Schlens, Mr. Fielder Slingluff and Mr. Lee Slingluff be disregarded. They testify positively that they informed Alice that she could not revoke the deed. She was advised to seek other counsel. They brought in the Maryland Reports containing the Williams and the Whitridge cases. Mr. Fielder Slingluff told her that she, like

272

the plaintiffs in these two cases, might one day wish to recall her act. She repudiated the idea. I know that the testimony of her sister, her brother-in-law, and her own, more or less conflicts with this; and while feeling sure that all who have testified for the plaintiff have been actuated alone by the best motives, and have only spoken what they conscientiously believe to be true, still I repeat I cannot set at naught the evidence of those whose highest duty it was to inform Miss Wilkins of the nature and consequences of her act, as to whether they have fulfilled this obligation.

(d) *Mr. Schlens' letter to Mrs. Schubert of October 15, 1900.* Is not the fact that Alice was fully informed as to the nature of her act corroborated by the letter of October 15, 1900, to her mother, written by her Uncle, just before she had sailed for home. This letter explains so clearly the situation at the time that it is here inserted in full. "Dear Catherine: Our visitors have now left us, and they will return to you tomorrow per steamer Deutschland. Nellie and Ernst are also in New York; they will see them off. I hope that all three have had a good time, and that they will have lots to tell you, as to what they have seen. With Alice I had a long and earnest conversation. Have explained to her that she could not respect and trust that man, and that mutual respect and confidence were the foundation, and the first conditions, of a happy marriage. If her father would still be living, he would positively refuse his consent. Alice realized the truth of all this, but she seems to be so taken up with that man, that I fear that nothing can save her, and that she with her eyes open is running into her own misfortune. I deem my duty to protect her interests, with all my might and with all my might to protect her estate. After a mutual talk with Alice, Dolly, Mamie and Willie, we proceeded to Mr. Slingluff's office, and Alice made a deed of trust, wherein she transfers her entire estate to me as trustee, so that she, like Mamie, only receives her entire income, but she can exercise testamentary disposition over same, which is not the case with Mamie. This deed of trust has been left in my keeping. The same shall not go into Court on record, that is, shall not become operative until Alice has talked with

you about the matter. She will then telegraph to me. So consider this seriously. Personally, I have less work if Alice's estate remains in her control, as it is now, but as the matter stands now, I would cheerfully undertake the extra work in order to safeguard Alice. It would be abominable if this nice estate, for which her father worked so hard, should be squandered, so that the blinded Alice would suffer poverty. Dolly told me that he would attend to it that Alice would make a contract before her marriage, so that her income would not be liable for his debts, and could only be used for her support. If all this is carried out of which Alice will of course tell Buchwaldt, then perhaps he will step back when he as a money hunter realizes that he cannot get his hands on the estate. *This deed of Trust cannot be revoked.* Alice said she understood everything and will explain things further to you—bond furnishings she can receive with consent of Court. Consider everything fully; these are serious matters which will have to be looked at from every viewpoint. With heartfelt greetings, yours,

AD. SCHLENS."

When Mr. Schlens wrote this most explicit letter, stating in terms that the deed could not be revoked, and that Alice said she understood everything, did he not think that Alice understood the irrevocable nature of the instrument? And is it not most difficult to reach any other conclusion but that she did at that time know that she was taking a step she could not retrace?

(e) *The attitude of Mrs. Schubert as to the Deed then and now.* Mrs. Schubert was utterly opposed to Alice's property being in trust. Her attitude in respect to the litigation about the will unmistakably shows this. But she was still more opposed to her daughter's marriage to Lieutenant Buchwaldt. Is it not reasonable to suppose that in her numerous talks with Alice, after Alice's return from America, she represented to her the sacrifice she would make in parting with the control of her estate, which would become necessary if she persisted in marrying. Here were two evils in the eyes of Mrs. Schubert, both of which could be avoided if Alice would break the engagement; but both of which must be

encountered if Alice persisted in her marriage. It is impossible for any intelligent mind to reach the conclusion that Mrs. Schubert did not know the irrevocable character of the deed; and it is difficult to believe that she did not use this as an argument with Alice to prevent her taking the other irrevocable step. So strong, however, is the wish father to the thought, that she, like Alice, now testifies, and I am convinced does so conscientiously, that she did not know that the deed could not be revoked.

(f) *If Deed revocable it would not have answered the purpose.* It is manifest and must have been clear to all concerned, including Alice, that had this deed been revocable at her option it would not have answered the purpose it was intended to subserve. There was no idea that Lieutenant Buchwaldt, if he married Miss Wilkins, would immediately take her property away from her by force, so that to remove it temporarily from his reach would be sufficient. The danger lay in that his wife, prompted by the love that made her resist her mother's demand to give him up, and knowing his embarrassments, would yield to his solicitations and give him her property. The only way to meet this situation was to put the property beyond her control by making an irrevocable conveyance. The reason for a deed of this description is nowhere more aptly expressed than in the learned opinion of Judge Phelps, in the case of Whitridge vs. Whitridge, 76 Md. 60-61; "A voluntary settlement by an heiress, such as that made by this deed, was not needed at its date and is not needed now, merely to protect the property against a future husband's debts or marital control. In the then existing and present state of legislation and society, the object of such a settlement manifestly is the protection of the woman herself; protection against the unpleasant necessity of saying no, against the possible disaster of saying yes. Its fundamental object is to promote the happiness of married life by placing a woman's fortune beyond the reach of a husband's solicitations and outside the risk of his business ventures. To put in such a deed a power of revocation, would simply be a standing suggestion to a mercenary husband to keep the woman in a continual worry until she executed the revocation. Plainly the insertion of a power of revocation would defeat the main object of such a settlement, and its absence therefrom affords no ground of attack."

The Court of Appeals say in Rogers vs. Rogers, 97 Md. 573, in speaking of a deed of trust: "Its execution (with the power of revocation therein) would have afforded but small protection to its beneficiaries with the means in it at any time to recall and annul it, and expose the property to the very contingencies against which it was designed to secure it."

(g) *The letters of Alice Wilkins at the time.* I quote from Alice's letter to Mr. Schlens, dated Glucksburg, February 7, 1901, ten days after she had sent the cable to record the deed: "Enclosed you will find the marriage contract. As you will note therein I will have the sole management of my estate. If this is not expressly mentioned the husband has the management. In the contract of the separation of estates the clause was inserted that I shall never be liable for his debts. To place my estate absolutely safe I telegraphed you "file deed." We had already agreed on everything and I would have had it then invested if Mama had not at first been so opposed to it." What does she mean by saying to place my estate absolutely safe, if she did not understand that she was putting the estate out of her control? The marriage agreement which was executed in December, gave her the control of her property, and freed it from liability for her husband's debts. Why then make a deed that could be revoked? How would such a conveyance make her estate absolutely safe? Or add any greater protection to her estate than that given by the marriage contract? All she would have to do would be to change her mind and revoke the deed? She would then have the principal of her estate under her control, and she would be just where she was before she made the deed, with only her personal power to resist should he desire her property. The making of the deed would have been but an idle ceremony. The same pressure that would have obtained from her her property where there was no deed, would have obtained from her a revocation and her property where there was a revocable deed. Again in speaking on the subject in her letter to Mr. Schlens, of

274

February 16, 1901, she says: "The deed of trust has been executed, and we can all feel assured that the money of my dear father cannot be squandered. It is now perfectly safe and the best I could do has been done."

(h) *Summary.*

To sum up: When we consider the knowledge Alice must have had as to the trust estate of her sister, Mamie, created by their father's will; her knowledge of the litigation in regard to her own share; the apprehension of danger that all of those related to her, and interested in her, shared in the event of her marriage to Lieutenant Buchwaldt; the circumstances surrounding the signing and acknowledging the deed; the explanation of its nature as testified to by the Messrs. Slingluff and Mr. Schlens; the withholding of final action for nearly four months; the correspondence at the time, especially the letter of October 15, 1900, from Mr. Schlens to Mrs. Schubert, and the two letters of Alice to Mr. Schlens just above quoted from; and that Alice was a woman more than twenty-three years of age, and, as indicated by her letters, of high intelligence; the conclusion is irresistible, that Alice Wilkins knew both at the time she signed and when she sent the telegram making it effective that the deed could not be revoked.

*Second. Was the deed the free, voluntary, unbiased act of Alice Wilkins, or was she coerced by the resistless importunities of her mother to execute it?*

(a) *The correspondence at the time.*

The opposition to the marriage of Alice to Lieutenant Buchwaldt upon the part of her mother began about the beginning of the year 1899. The letters from Mr. Schlens to Alice during that year show that he was transacting business with her, sending her her income and giving her information in regard to her estate. His letter of December 30, 1898, incloses her a draft for 5,000 marks. His letter of March 29, 1899, incloses a draft for 10,000 marks; and also an account of the corpus of her estate, describing the nature and character of the securities. After stating that it is impossible for him to give everything in detail, he says: "Haven't you the desire to come over here and take a look at things

for yourself? In the matter of your suit I hardly expect the decision of the Court of Appeals before June." On July 7, Mr. Schlens wrote fully to Mrs. Schubert, telling her of the decision of the Court of Appeals. And on the twenty-sixth of the same month he wrote to Alice. In this letter he tells her that she is entitled to her share absolutely, that his trusteeship is over, incloses a form of power of attorney for her to execute, so that he can act as her agent, speaks of a good sale of some of the property that is in prospect, and concludes by saying: "Nellie (his daughter) and Ernst (his son-in-law) are now on a trip to Europe, perhaps you will make up your mind when they return to come along with them." In his letter of October 4, 1899, he encloses a draft for 10,000 marks, and ends by saying: "Nellie, Ernst and little Dora have returned after a quick and pleasant voyage. I had hoped that you would accompany them for a visit." The last letter of that year is of December 29, when he says, according to her request, he shall make her no more remittances. Here we have during this year three invitations by Mr. Schlens to visit him at a time when there was not in the minds of any one the thought of a deed of trust; but on the contrary the litigation was in progress and concluded, that determined the share of Alice was hers absolutely. We now come to the year 1900. In his letter of January 22 he tells Alice of the $5,000 charge made by the lawyers in her case. In the letter of March 19, he sends her his first statement. In his letter of June 13, he encloses what he terms a final statement. In his letter of July 2, to Mrs. Schubert, he says: "Your letter of June 21 duly received and I look forward to the visit of Mamie and Dolly with great pleasure. Hoping you can prevail upon Alice to come along, which would undoubtedly do her good. They can live with me, I have plenty of room." In his letter to Mrs. Schubert of August 24, he says: "Our travelers left us on Tuesday, the 21st. I suppose they are at Niagara Falls. From there they will go to Chicago, where Charles Wilkins will look after them. * * * * We have as yet not talked about the estate, etc. This has been put off until their return." In his letter to Mrs. Schubert of October 1st, he says:

"Your letter duly received. The travelers returned after their long trip on the 28th of September, safe and sound. They are delighted with all the grand things they have seen. They are now resting up in 'Fairfield' from their travels. I have spoken to Mamie about Alice and will now get Dolly to explain the matter to me fully, and will then try what I can accomplish with Alice." Then comes the letter of Mr. Schlens to Mrs. Schubert, which has already been set out in full, that of October 15, 1900.

I have given this correspondence at some length, because it shows better than we can get from the recollection of the parties, the true state of facts as they existed at the time.

(b) *The influence of Mr. Schlens.*

There is nothing in the evidence to show any effort upon the part of Mr. Schlens to coerce Alice to sign the deed. On the contrary his conduct appears to be most conservative and open. No doubt he was of the opinion that if Alice persisted in marrying Lieutenant Buchwaldt, it was eminently wise that she should protect her property. Any other intelligent man, having the interest of his ward and sister-in-law at heart, would have felt the same way. I find nothing in testimony to make me think that Mr. Schlens in any way improperly or unduly urged or influenced Alice to execute the deed. Alice Wilkins in her testimony acquits him of such a charge (Alice Wilkins, page 46): "My uncle did not influence me. I was, however, under the influence of my mother, and was forced by my mother to make the contract."

(c) *Did Mrs. Schubert coerce Alice to make the deed of trust?* This leads to the question we are now discussing: did her mother coerce or unduly influence her? When Mrs. Schubert heard that Alice had signed the deed, she said that Alice had acted hastily. This is the testimony of those who are on the side of Alice in this attempt to set aside the deed. We know that Mrs. Schubert was strongly opposed to Alice's property being in trust. I might add that she had been so opposed to an unreasonable extent. The evidence shows that the only reason Alice did not send sooner than she did the telegram that directed the deed to be recorded, was because her mother op-

posed her doing so. This is shown by Mrs. Schubert's letter of December 26, 1900, to Mr. Schlens, in which she writes: "I have withheld her consent to the tying up of her money in the hope that she would change her mind and would marry a respectable man who would later manage her estate. But that will not be, and before leaving I gave her the advice, to write you that you have it legally settled in Court." Mrs. Schubert in her letter of January 21, 1901, to Mr. Schlens, says: "She (referring to Alice) has at least had sense enough to tie up her estate over there. Here in Germany it is necessary to make a marriage contract. Alice has made one, but had not shown it to me, the foolish girl has lost all confidence in me." Mrs. Schubert seems not to have been aware at that time that she had "undue influence" over her daughter. And Alice seems not to have consulted with and asked the advice of her mother in making an instrument, similar in its nature, to the deed, viz: the marriage contract. Again in her letter of February 8, 1901, Mrs. Schubert says: "I have reproached myself often that I hindered the tying up of Alice's money."

It was only when Mrs. Schubert felt there was no longer any hope of breaking off the engagement, that she wrote to her daughter, who was then visiting the parents of Lieutenant Buchwaldt, urging her to send the telegram. There is nothing in the contemporaneous correspondence reflecting as it does the attitude of all concerned in regard to the deed, that indicates any unwillingness or opposition on the part of Alice to secure her property by putting it in trust. For over a month before the cable was sent her mother had not communicated with her, therefore, the only overt act, for one month before the sending of the telegram, was the letter from Mrs. Schubert to Alice asking her to send the telegram. It is interesting to note that the person most opposed to Alice's property being in trust is the one accused in coercion in causing it to be put in trust. The truth is that Mrs. Schubert did not want Alice's property to be put in trust, but she did not want Alice to marry Lieutenant Buchwaldt. She felt influenced as she had been by the reports she had received, of the conduct and habits of Lieutenant Buchwaldt,

that it was not only wise but necessary that the property should be placed beyond his reach. Under the like circumstances any other sensible person would have left the same. Why cannot we attribute to Alice an equally sensible point of view? If her fiancee were a spendthrift or embarrassed by debts, she would, by putting her property in trust, not only safeguard herself and children, should she have any, but protect from poverty her husband himself. If he turned out, as it seems he has, to be the right kind of man, being a soldier, and likely unskilled in business matters, what could be the advantage in her or his having control of the principal of the estate, when the income was adequate for all reasonable wants and when the principal was in the hands of a man of wide business experience, who had through the years demonstrated his capacity in its management? When a person does an improvident thing, the authorities hold that that is not alone sufficient to strike down the act. It is only evidence that the act was not voluntarily done. But when a person, under the then conditions, does a wise thing, the converse is true, and the act itself tends to indicate that it was voluntarily done. When Alice Wilkins made the deed she acted wisely; and she knew she was doing the sensible thing. Read again her words in her letter to her uncle of February 7, 1901: "To place my estate absolutely safe I telegraphed you "file deed." We had already agreed on everything and I would have had it then invested if Mama had not at first been so opposed to it." And what she says in her letter of February 18, 1901: "The Deed of Trust has been executed. We can all feel assured that the money of my dear father cannot be squandered. It is now perfectly safe and the best I could do has been done." If she means what she wrote, she shared the thoughts of all those interested in her welfare, and acted as a sensible woman would have acted under the like circumstances. While no doubt this deed would never have been executed had the opinion first held by the family in regard to Lieutenant Buchwaldt continued unchanged; still, when rumors reached Mrs. Schubert and her children, part of which doubtless was untrue, but part, of which is not even now denied, the natural consequences followed: the apprehension of danger to the estate and the steps taken to avoid it. Let us look squarely at this case. Mrs. Schubert seems to have been more opposed to the estates of her children being in trust than anyone else. The only direct pressure that she put upon her daughter to cause her to place her property in trust was the letter written to Alice urging her to send the telegram. Alice in the letter just quoted practically says she would have acted long before had not her mother prevented her. It is true that Alice's mother and all the rest of the family except her grandmother, were opposed to the marriage. It is true that they, especially her mother, apprehended danger to Alice's property should she marry. It is true they all thought it necessary to protect Alice's property that she should put it in trust. It is true that the relations between Alice and her mother, due to the engagement were most strained, painful and distressing. But unless you can say under like circumstances, calling as they did for an act of this character, no young girl can exercise her free will, so as to do what should be done to protect herself, this deed must stand. There is nothing, as has been said already, in the correspondence at the time, indicating that Alice was at all opposed to putting her property in trust. On the other hand her letters written shortly after the telegram was sent directing the deed to be recorded, show not only that she was then willing to make the deed, but that she had always been from the time she had signed it. I am of the opinion that she was not coerced by her mother, but that the execution of the deed was her free, voluntary and unbiased act.

## 10. DOES THE DOCTRINE OF CONFIDENTIAL RELATION APPLY TO THIS CASE?

It is said in the case of Whitridge vs. Whitridge, 76 Md. on page 75: "It is the firmly settled law of Maryland that a gift or voluntary conveyance between living parties standing in confidential relation of parent and child is prima facie void, and when assailed by the donor or grantor, can only be upheld if satisfactorily proved to have been the free, voluntary and unbiased act of the person who made it." This is the test that I have applied to this case with the result above stated. I

am inclined, however, to the view that the doctrine is not here applicable. Judge McSherry, in the Whitridge case, quoting from Lord Romilly, in Cook vs. Lamotte, 15 Beav. 239, states the doctrine as follows: "The Rule in cases of this description is this: Where those relations exist by means of which a person is able to exercise a dominion over another, the Court will annul a transaction under which a person possessing that power takes a benefit unless he can show the transaction was a righteous one." Mr. Schlens took no benefit under the deed. The prospects of his descendants taking under the deed was remote, and lessened rather than increased by it. The Court of Appeals has said that commissions are not such a benefit as to come within the rule. They are but compensation for services rendered: Brown vs. Mercantile Trust Co., 87 Md. 392. Nor is there any allegation in the bill that Mr. Schlens imposed upon Alice or coerced the execution of the deed. The evidence acquits him of any such conduct. Should this doctrine apply to him when the undue pressure is said to have been exerted by another? Would a rule be reasonable or fair that required him to show that Mrs. Schubert, three thousand miles away from him, did not exert such influence? What means would he have of doing this, when she is co-operating in the attempt to break the deed? I do not think the doctrine can be invoked in this case, but I think the burden of proof has been met, should it be applicable.

## 11. THE GROUNDS OF OBJECTION TO THE DEED DISCUSSED.

In this age when there seems to be a disposition to avoid as far as possible in the administration of the law doing injustice in the particular case to be decided, Courts are naturally, though perhaps unconsciously, influenced by a consideration of the effect of the decision. I am not impressed with any hardship in this case, resulting from the upholding of the deed of trust. Mrs. Buchwaldt's father made a fortune for her, and her uncle by his wise and able management has preserved and increased that fortune. She has a fine estate, safeguarded and protected in every way, so that comfort and luxury are guaranteed to her for her life, with an ample inheritance for her children. Undoubtedly her father would have left her share in trust had she been born when he made his will. He did not leave Mrs. Schlens' share in trust, because he knew that she was married to a man in every way capable of taking care of her estate. The shares of Charles and Mamie he left in trust, and to William he did practically the same, leaving him only a life estate in his share. It is a most usual thing for a parent to safeguard the property that he gives to a daughter by leaving it in trust. The whole doctrine of the spendthrift trust in the English law is based upon the desirability and necessity of protecting a woman's estate. I apprehend that there was in the mind of the draftsman of Mr. Wilkins' will a legal embarrassment in attempting to create a trust for a child that might be born after its father's death. Otherwise, there is no possible reason to distinguish between Mamie and Alice. The hardship that is complained of in this case is that the expense incident to the trust lessens the net income. Let us examine this complaint:

(a) *The Income Account for the Year* 1912.

Take the income account for the year 1912:

Gross income ..............$11,351.40
Expenses ...................  2,232.77

Net income ..............  $9,118.63

The expenses consist of the following:

Trustee's commissions ....... $553.97
Court costs ................  44.75
Counsel fees ...............  35.00
Rent safe deposit box........  20.00
Tax on securities............  398.82
Tax on real estate, etc., water rent ......................  396.76
Repairs and necessary expenses ...................  493.80
Other necessary expenses, Sigmund's salary, etc..........  266.67
Premium on bond............  23.00

$2,232.77

The four items of expense that the estate would not be subjected to, if not in trust or not managed by an agent, reducing the income, are:

Trustee's commissions........ $553.97
Court costs ................  44.75

Tax on securities............... 398.82
Premium on bond............... 23.00

Total amount .............$1,020.54

Less than 10 per cent. of the gross income is incident to the estate being held in trust, with the trustee residing in Maryland. What is received in return for this? The wise and sagacious management of a most experienced man, who has preserved and increased the estates under his charge. Do Mrs. Buchwaldt and those around her appreciate the advantages derived from the management of an estate consisting at one time largely of suburban property, in its transition into securities and property of an income bearing character? Mr. Schlens is now getting to be an old man; his trusteeship will soon cease. Indeed he may be willing to retire now. In that event Mrs. Buchwaldt, who has the power under her deed of trust to appoint his successor, may ask the Court to appoint her mother, her sister, or her husband. If the new trustee declined to accept commissions that item of expense would disappear. As the new trustee would not be a resident of the State of Maryland, there would be no tax upon the securities and that item would go.

The result would be that the expense of the administration of the trust would be reduced to less than $100, in exact figures $67.75. This would be a considerable saving, but not true economy, for the experience and knowledge and wisdom of Mr. Schlens would be gone.

(b) THE INCOME ACCOUNT FOR THE YEAR 1913.

Now let us take the income account for the year 1913:

Gross income ...............$11,536.81
Expenses .................... 2,384.62

Net income ............... $9,152.19

The expenses consist of the following:

Trustee's commissions........ $541.53
Court costs ................. 43.75
Counsel fees................. 35.00
Rent safe deposit box........ 20.00
Tax on securities............ 167.74
Tax on real estate, etc........ 725.07
Repairs and necessary expenses .................... 395.36

Insurance ................... 166.50
Sigmund's salary............. 266.76
Bond ....................... 23.00

$2,384.62

The four items of expense that the estate would not be subjected to, if not in trust or not managed by an agent, reducing the income, are:

Trustee's commissions........ $541.53
Court costs ................. 43.75
Tax on securities............ 167.74
Premium on bond............. 23.00

Total amount ............. $776.12

Less than seven per cent. of the gross income. I will not repeat what has already been said in regard to the income of 1912. It will be observed, however, that the security tax has considerably lessened. Possibly there should have been included in the items that could be saved from the counsel fees of $35 allowed in each account.

What is the advantage to the plaintiff in setting aside the deed and in having the absolute control of her property? Her husband upon whom the management of the estate would naturally fall is a soldier, and likely untrained and inexperienced in business affairs. He lives in Germany and not in this country, where a considerable amount of the estate is still located, and the rest is invested in American securities, about which he probably knows little. There seems to be no advantage in taking the estate out of trust so far as its management is concerned. Does the deed under existing conditions work injustice to anyone? It certainly does not to Mrs. Buchwaldt's children. It assuredly does not to her. Does it to her husband? Possibly, yes, in one contingency, that is if he should outlive her. Having children, she could leave him nothing; all would go to the children. He, however, has the great satisfaction of knowing that his children would be amply provided for, while he would have his salary entirely for himself. If this be a hardship, is not his conduct before his marriage responsible for it? Should he complain? I am not aware that he does or would.

The plaintiff has a fine estate, safeguarded and protected, that now yields to her and those near and dear to her the comforts and luxuries of life. Is it not the part of wisdom to let well

enough alone? Would it not be a mistake for her, could she succeed in doing so, to take her estate from where it now is, safe and secure, and place it where either unwise management or business vicissitudes might reduce her and her children; as it has done many before them, to poverty and want. I have written out my views more fully than perhaps there is any occasion for. If these views are sound they will recommend themselves to the Court of Appeals, should the case be taken there. If they are not, the errors in my reasoning and conclusions will be pointed out by the counsel who represent the plaintiff. I am of the opinion that the deed of trust executed by Alice Wilkins was her free, voluntary, and unbiased act at the time she made it; and I will sign a decree dismissing the bill.